## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------x

NATIONAL ASSOCIATION OF
THEATRE OWNERS; NATIONAL
ASSOCIATION OF THEATRE OWNERS
OF NEW JERSEY; AMERICAN MULTI-
CINEMA, INC.; CINEMARK USA, INC.;
REGAL CINEMAS, INC.; BJW
ENTERTAINMENT INC.; BOW TIE
CINEMAS, LLC; and COMMUNITY
THEATERS LLC,

                      Plaintiffs,

        - against -

PHILIP D. MURPHY, in his official capacity
as Governor of New Jersey; and JUDITH
PERSICHILLI, in her official capacity as
Acting Commissioner of Health,

                  Defendants.

-------------------------------------------------------x

    Case No. 3:20-cv-08298-BRM-TJB

    ECF Case

    **MEMORANDUM OF LAW IN
    SUPPORT OF PLAINTIFFS'
    APPLICATION FOR A
    TEMPORARY RESTRAINING
    ORDER AND PRELIMINARY
    INJUNCTION**

    **<u>ORAL ARGUMENT REQUESTED</u>**

DAVIS WRIGHT TREMAINE LLP
Geoffrey S. Brounell (member of the D.N.J. bar)
Robert Corn-Revere (admitted *pro hac vice*)
Janet Grumer (admitted *pro hac vice*)
Martin L. Fineman (admitted *pro hac vice*)
John D. Freed (admitted *pro hac vice* )

1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
geoffreybrounell@dwt.com
bobcornrevere@dwt.com
janetgrumer@dwt.com
martinfineman@dwt.com
jakefreed@dwt.com

Attorneys for Plaintiffs National Association of Theatre
Owners, National Association of Theatre Owners of New
Jersey, American Multi-Cinema, Inc., Cinemark USA,
Inc., Regal Cinemas, Inc., BJK Entertainment Inc., Bow
Tie Cinemas, LLC and Community Theaters LLC

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................. 1

II.   FACTUAL BACKGROUND ............................................................ 3

    A.   The Parties ............................................................................. 3

        1.   The NATO Plaintiffs............................................................ 3

        2.   The Exhibitor Plaintiffs....................................................... 4

        3.   Defendants ......................................................................... 4

    B.   COVID-19, New Jersey's Economic Shutdown, and the Effects on the Movie Theatre Industry. .......................................................... 4

    C.   New Jersey's Preferential Reopening of Certain Institutions. ............................... 5

    D.   Defendants' Disparate Treatment of Movie Theatres............................................. 8

    E.   Movie Theatres Have Adopted Measures to Protect Public Health. .................... 10

    F.   Effect of the Executive Orders on Movie Theatres. ............................................ 15

III.  LEGAL STANDARD........................................................................ 16

IV.  ARGUMENT .................................................................................. 16

    A.   The Power to Enact Public Health Laws Is Subject to Constitutional Limitations ...................................................................... 16

    B.   Plaintiffs Are Likely to Succeed on the Merits....................................... 18

        1.   Defendants' Orders Violate the Equal Protection Guarantee of the United States Constitution and Article I ¶ 1 of the New Jersey Constitution............................................................. 18

            a.   Defendants' Conduct Infringes Plaintiffs' Fundamental Right to Free Speech, Requiring Strict Scrutiny.......................... 19

            b.   Defendants' Orders Cannot Withstand Even Rational Basis Review. ...................................................... 24

        2.   Defendants' Orders Violate Freedom of Speech Guaranteed by the First Amendment and New Jersey Constitution, Article I, ¶ 6. ............... 25

    C.   Plaintiffs Are Suffering Irreparable Harm. .......................................... 26

    D.   The Balance of Equities and Public Interest Favor Plaintiffs. ............................. 27

V.    CONCLUSION.............................................................................................................. 29

4821-4493-4849v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Able v. U.S.*,
  847 F. Supp. 1038 (E.D.N.Y 1994) .......................................................................................27

*Altman v. County of Santa Clara*,
  2020 WL 2850291 (N.D. Cal. June 2, 2020) .........................................................................17

*Arkansas Writers Project v. Ragland*,
  481 U.S. 221 (1987) ...............................................................................................................18

*AT&T v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994) ...................................................................................................16

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ..................................................................................................................25

*Bery v. City of New York*,
  97 F.3d 689 (2d Cir. 1996) .....................................................................................................25

*Camelot Banquet Rooms, Inc. v. U.S. S.B.A*,
  2020 WL 2088637 (E.D. Wis. May 1, 2002) .....................................................................16, 20

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) ................................................................................................26

*Chavarriaga v. New Jersey Dept. of Corr.*,
  806 F.3d 210 (3d Cir. 2015) ...................................................................................................23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ...............................................................................................................20

*Cross Culture Christian Center v. Newsom*,
  2020 WL 2121111 (E.D. Cal. May 5, 2020) ..........................................................................17

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975) ...............................................................................................................26

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...............................................................................................................26

*First Baptist Church v. Kelly*,
  2020 WL 1910021 (D. Kan. Apr. 18, 2020), *motion to modify restraining
  order denied*, 2020 WL 1984254 (D. Kan. April 27, 2020) ...................................................16

*Freedman v. Maryland*,
  380 U.S. 51 (1965) ............................................................................................................19, 25

4821-4493-4849v.1

*FW/PBS v. City of Dallas,*
    493 U.S. 215 (1990) ........................................................................................24, 25

*Greater Phila. Chamber of Commerce v. City of Phila.,*
    949 F.3d 116 (3d Cir. 2020) .....................................................................................25

*Hart v. Electronic Arts, Inc.,*
    717 F.3d 141 (3d Cir. 2013) .....................................................................................19

*Hickox v. Christie,*
    205 F. Supp. 3d 579 (D.N.J. 2016) ..........................................................................16

*In re Inter-Op Hip Prosthesis Liability Litig.,*
    204 F.R.D. 330 (N.D. Ohio. 2001) ..........................................................................27

*Jacobson v. Mass.,*
    197 U.S. 11 (1905) ...................................................................................................16

*Jew Ho v. Williamson,*
    103 F. 10 (C.C.D.Cal. 1900) ....................................................................................16

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ............................................................................................2, 19

*McCarthy v. Cuomo,*
    2020 WL 3286530 (E.D. N.Y. June 18, 2020) ........................................................17

*Minard Run Oil Co. v. U.S. Forest Service,*
    670 F.3d 256 (3d Cir. 2011) ...............................................................................26, 27

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
    460 U.S. 575 (1983) .................................................................................................19

*Near v. Minnesota,*
    283 U.S. 697 (1931) ...........................................................................................24, 25

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 51 (1965) ...................................................................................................24

*Neiderhiser v. Borough of Berwick,*
    840 F.2d 213 (3d Cir. 1988) .....................................................................................19

*News America Pub. Inc. v. FCC,*
    844 F.2d 800 (D.C. Cir. 1988) .................................................................................18

*Niemotko v. Maryland,*
    340 U.S. 268 (1951) .................................................................................................19

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................................27

iv

*Odebrecht Const., Inc. v. Secretary, Fla. Dept. of Transp.,*
    715 F.3d 1268 (11th Cir. 2013) ...........................................................................27

*Plyler v. Doe,*
    457 U.S. 202 (1982).............................................................................................18

*Police Dept. of City of Chicago v. Mosley,*
    408 U.S. 92 (1972)...............................................................................19, 20, 21

*Regan v. Time, Inc.,*
    468 U.S. 461 (1987).............................................................................................20

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995).............................................................................................20

*Schneider v. New Jersey,*
    308 U.S. 147 (1939).........................................................................................2, 22

*Shuttlesworth v. Birmingham,*
    394 U.S. 147 (1969).......................................................................................24, 25

*South Bay United Pentecostal Church v. Newsom,*
    140 S.Ct. 1613 (2020).....................................................................................17, 18

*Spangler v. U.S.,*
    415 F.2d 1242 (9th Cir. 1969) .............................................................................27

*Suntrust Bank v. Houghton Mifflin Co.,*
    268 F.3d 1257 (11th Cir. 2001) ...........................................................................27

*TD Bank N.A. v. Hill,*
    928 F.3d 259 (3d Cir. 2019).................................................................................27

*United States v. Playboy Entm't Grp. Inc.,*
    529 U.S. 803 (2000).............................................................................................20

*United States v. Stevens,*
    559 U.S. 460 (2010).........................................................................................3, 20

*Vance v. Universal Amusement Co.,*
    445 U.S. 308 (1980).............................................................................................25

*Village of Willowbrook v. Olech,*
    528 U.S. 562 (2000) (per curiam).......................................................................23

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976).........................................................................................2, 22

*Winters v. New York,*
    333 U.S. 507 (1948)...............................................................................................2

v

*Zamboni v. Stamler*,
    847 F.2d 73 (3d Cir. 1988)........................................................................................27

**Rules**

Federal Rules of Civil Procedure 65(b) ...................................................................15

**Regulations**

Executive Order No. 104 ............................................................................................4

Executive Order No. 107 ............................................................................................4

Executive Order No. 152 ..............................................................................4, 5, 6, 14

Executive Order No. 153 ............................................................................................6

Executive Order No. 154 ............................................................................................6

Executive Order No. 155 ............................................................................................6

Executive Order No. 156 ............................................................................................6

Executive Order No. 157 ...................................................................................*passim*

Executive Order No. 158 ............................................................................................7

Executive Order No. 161 ............................................................................................7

**Constitutional Provisions**

New Jersey Constitution, Article I ......................................................................18, 24

United States Constitution, First Amendment ....................................................*passim*

United States Constitution, Second Amendment ....................................................17

United States Constitution, Fourteenth Amendment ..............................................18

**Other Authorities**

*Federal Practice & Procedure*, § 2948.1 (2d ed. 1995)..........................................25

*Public Health Principles for a Phased Reopening During COVID-19: Guidance*
    *for Governors*......................................................................................................9

4821-4493-4849v.1

## I.   INTRODUCTION

As the nation seeks to recover from a global virus outbreak that has disrupted the normal flow of daily life for most Americans, Plaintiffs, movie theatre owners in New Jersey, along with the state and national associations of theatre owners, have worked proactively to be able to reopen movie theatres in a manner consistent with protecting the public's health.  Plaintiffs have presented detailed, comprehensive plans to the Governor's office.   Theatre owners and their trade associations have done the same in other states, and public officials in 45 of the 50 states have found their efforts to be fully consistent with measures to reopen the states while protecting their citizens.

Not so in New Jersey.  Movie theatres must remain closed by government order, while other places of public assembly, including places of worship, libraries, and shopping malls (and even tattoo parlors and massage parlors) have been allowed to reopen to the public.  Defendants Governor Philip D. Murphy and Acting Commissioner of Health Judith Persichilli have failed to provide a legally satisfactory reason for this discriminatory treatment.  Defendants have not based this discriminatory treatment on any identifiable differences in public health risks, nor do they claim that movie theatres pose a greater health risk than these other venues, some of which present far more difficult challenges to practices such as physical distancing.  Nor can this discriminatory treatment be explained by a failure by movie theatre operators to propose comprehensive safety plans for the reopening of movie theatres that address all aspects of theatre operations.  Plaintiffs have done just that, but their detailed proposals have been inexplicably ignored.

Defendants have instead based this discriminatory treatment on their naked preference for certain types of speech and blind indifference to the rights and interests of Plaintiffs and their patrons.  Governor Murphy openly declared that places of worship and places of political assembly could be reopened while theatres remain closed because, in his view, "religious

1

services and political activity are particularly important to the functioning of the State and of society."  This arbitrary ranking of constitutional interests fails to grasp that for almost seven decades the Supreme Court has held that the First Amendment fully protects exhibition of movies, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952), and that entertainment is constitutionally protected the same as "Keats' poems or Donne's sermons."  *Winters v. New York*, 333 U.S. 507, 528 (1948).

The Governor has ignored the constitutional issues and suggested that Plaintiffs and their patrons should accept second-tier constitutional status not because of health risks, but by asserting there is an "especially high number of available outdoor and virtual options for members of the public to view and listen to movies."  Not only is this assertion factually untrue, it fails to account for the long-established principle that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  *Schneider v. New Jersey,* 308 U.S. 147, 163 (1939).  The First Amendment prohibits the government from closing down a venue on the ground that "the speaker's listeners could come by his message by some other means."  *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757 n.15 (1976).

Defendants' arbitrary and discriminatory treatment of the Plaintiffs clearly violates constitutional guarantees of equal protection and freedom of expression.  The government could not, in the name of public health, for example, selectively close down religious gatherings of Christians while permitting them for Muslims or Jews, just as it could not discriminate based on political affiliation, prohibiting assemblies of Democrats while allowing them for Republicans. Nor can it single out movie theatres and close them down while permitting other places of public assembly to remain open.  These same principles govern New Jersey's reopening schedule, and bar Defendants from favoring the rights of some speakers over others.  It is not for the Governor of a state to decide which speech may be permitted based on his or her personal estimation of its

2

relative value.  The First Amendment protects against such arbitrary government decisions; "it does not leave us at the mercy of *noblesse oblige*."  *United States v. Stevens*, 559 U.S. 460, 480 (2010).

## II.     FACTUAL BACKGROUND

### A.     The Parties

#### 1.     The NATO Plaintiffs

Plaintiff NATO, a voluntary membership, non-profit organization of movie theatre owners throughout the United States and abroad, is the largest film exhibition trade organization in the world.  It represents over 35,000 movie screens in all fifty states, the District of Columbia, and Puerto Rico, as well as additional cinemas in 98 countries worldwide.  NATO's membership includes owners of movie theatres throughout the State of New Jersey that are affected by and subject to the Governor's orders discussed herein.  NATO's mission is to unite for the mutual benefit, protection, and improvement of the theatrical and entertainment industry, addressing issues such as new technologies, legislation, marketing, movie theft, and the First Amendment. Fithian Dec. ¶¶ 2, 3.[1]

Plaintiff NATO NJ is a voluntary membership, non-profit organization of movie theatre owners, operators, executives, and managers throughout New Jersey, all of which are affected by and subject to the Governor's orders discussed herein.  NATO NJ's purpose is to provide its members with vocational advice, professional guidance, and to further promote the welfare of New Jersey's movie theatres.  NATO NJ carries out its mission by, among other things, working on behalf of New Jersey motion picture exhibitors on state and local governmental issues affecting movie theatres, providing educational workshops, and offering financial support to the

---

[1] The Declaration of John Fithian, President of NATO, is cited herein as "Fithian Dec."

3

many student-employees and children of employees interested in further education.   Piechota Dec. ¶ 5.[2]

### 2.   The Exhibitor Plaintiffs

The other Plaintiffs are a broad-based group of movie theatre companies that exhibit films in the State of New Jersey:  BJK, Bow Tie, and Community Theatres each own from one to five theatres in New Jersey, while AMC, Cinemark, and Regal are the three largest movie theatre chains in the country, including many throughout this State.   Altogether, the Exhibitor Plaintiffs operate nearly fifty movie theatres across New Jersey.   Each Exhibitor Plaintiff is a member of both NATO and NATO NJ.  Exhibitors' Dec. ¶ 3.[3]

### 3.   Defendants

Defendant Philip D. Murphy is the Governor of New Jersey and Defendant Judith Persichilli is the New Jersey Acting Commissioner of Health.   Defendants issued the orders challenged herein.  Fithian Dec., Exhs. A – L.

### B.   COVID-19, New Jersey's Economic Shutdown, and the Effects on the Movie Theatre Industry.

This case concerns Defendants' Executive Orders closing, then discriminatorily allowing the reopening of, certain businesses and institutions.  Governor Murphy issued Executive Order No. 104 on March 16, 2020, directing New Jersey residents to stay at home except as to maintain continuity of operations for certain specified essential services.  Fithian Dec., Exh. A.  Movie theatres were not deemed by the Governor to be an essential service.   Although this Executive Order recognized that movie theatres "are vital to the economic health of the State," it ordered the closure of "Entertainment centers, including but not limited to, movie theaters . . ." as of

---

[2] The Declaration of Robert Piechota, President of both BJK and NATO NJ, is cited herein as "Piechota Dec."

[3] The Declarations of Thomas J. Arnold, Matt Eyre, Peter Lieu, Joseph Masher, and Robert Piechota are cited herein collectively as the "Exhibitors' Dec."

4821-4493-4849v.1

March 16, 2020.  It provided that these facilities are "to remain closed to the public for as long as this Order remains in effect."  The Governor's subsequent Executive Order No. 107, issued March 21, 2020, reinforced and extended the earlier closure of movie theatres.  Fithian Dec., Exh. B.  A later Executive Order from the Governor characterized Executive Order No. 107 as "cancel[ing] all gatherings, and clos[ing] all recreational and entertainment businesses." Executive Order No. 152, at 2, Fithian Dec., Exh. E.

Thus, movie theatres, including the members of NATO NJ and NATO and those owned by the Exhibitor Plaintiffs, have been and will be remain closed and prevented by the Governor's orders from presenting films of significant artistic, cultural, political, and popular merit.  Movie theatres have suffered and continue to suffer significant loss of income, loss of profits, harm to reputation, and have had to lay off, furlough, and reduce the hours of thousands of their employees.

**C.    New Jersey's Preferential Reopening of Certain Institutions.**

On May 18, 2020, Governor Murphy issued a "reopening roadmap" for the State.  Fithian Dec., Exh. C.  The roadmap describes a series of reopening "stages," starting with what the Defendants deemed to be low-risk activities and advancing toward what the Defendants deem to be higher-risk activities.  Defendants' reopening roadmap places movie theatres in "Stage 3," which includes "limited entertainment."  New Jersey is currently in "Stage 2" of the reopening roadmap, and on June 19, 2020 Guidance from the Governor's office confirmed that "[i]ndoor entertainment businesses, such as movie theaters and arcades, will remain closed."  Defendants have provided no timeline for the commencement of Stage 3 or for the reopening of movie theatres.

Defendants began relaxing restrictions on various types of establishments following the issuance of the "reopening roadmap."  In Executive Order 152, issued on June 9, 2020, the

Governor lifted restrictions on certain activities,[4] including some indoor gatherings, while restrictions on others, including movie theatres, remain in place.  Fithian Dec., Exh. E.  Permitted indoor gatherings were subject to restrictions regarding crowd size, face coverings, social distancing, personal contact, handling physical items, etc.  Executive Order No. 152, at 6-7. However, even though movie theatres could meet all of these requirements they were not permitted to reopen.

The Executive Order explained that the unequal treatment was not based on different health risks, but on the Defendants' view of the social utility of the gathering.  It acknowledged that during periods of especially high community virus transmission "[religious and political] gatherings must be limited to the same degree as any other," but because constraints were being loosened, "the restrictions on these gatherings [religious and political] can be relaxed to an even greater degree than for other gatherings."  This was because, in Defendants' ranking of types of speech and assembly, "certain gatherings – including religious services and political activity – are particularly important to the functioning of the State and of society."

Beginning with Executive Order No. 152, and continuing through the rest of June 2020, Governor Murphy issued a series of Executive Orders directed toward different aspects of the reopening.  Executive Order No. 153, issued on June 9, 2020, allowed certain recreational and entertainment businesses to reopen their outdoor spaces to the public.  Fithian Dec., Exh. F. Executive Order No. 154, issued June 13, 2020, allowed "indoor personal care facilities" to reopen to the public, including facilities requiring close personal contact such as massage parlors, tattoo parlors, tanning salons, electrology facilities, spas, barber shops, beauty salons, and nail salons.  Fithian Dec., Exh. G.  Executive Order No. 155, issued June 18, 2020, allowed

---

[4] Executive Order No. 152 recited as reasons for the easing a decrease in the rate of reported new cases of COVID-19 in New Jersey, in the total number of individuals being admitted to hospitals for COVID-19, and the rate of reproduction of COVID-19 infections in the State.

degree-granting institutions of higher education to resume in-person instruction to students for curricula that require lab, technical, clinical, or hands-on instruction.  Fithian Dec., Exh. H.  Executive Order No. 156, issued June 22, 2020, "further relax[ed] the limits on indoor and outdoor gatherings," *id.* at 4, including again providing special preferential treatment for religious services and political activities.  Fithian Dec., Exh. I.  Movie theatres were not allowed to reopen.

On June 26, 2020, Governor Murphy issued Executive Order No. 157, which allowed retail establishments and shopping malls, casinos, certain indoor recreational facilities (not including movie theatres), individualized instruction at gyms and fitness centers, and indoor dining in restaurants, to reopen.  Fithian Dec., Exh. J.  It authorized the reopening of libraries, museums, aquariums, and public and private social clubs, but expressly excluded movie theatres. *Id.* at 3, 4-5.   It commanded that "performance-based locations such as movie theatres, performing arts centers, and other concert venues, must remain closed."  The Executive Order did not address the extent to which movie theatres can adopt procedures that fully comply with the same health requirements as other indoor gatherings that are now permitted.  Instead it assumed that there was no adverse impact (constitutional or otherwise) from the continued closure of theatres, asserting that "there are an especially high number of available outdoor and virtual options for members of the public to view and listen to movies" *Id.* at 4-5.  The Executive Order does not state any factual basis for this assertion.[5]

---

[5] The Executive Order does not explanation what "especially high number" of "outdoor" venues for movies the Governor had in mind, as there is only one drive-in movie theatre in New Jersey.  Piechota Dec., ¶ 21.  As to virtual means of watching movies, only a small number of the movies that would have appeared in movie theatres from mid-March to date have been offered through virtual means.  Fithian Dec., ¶ 24.  The Executive Orders do not suggest the availability of alternative avenues of communications are reasons to delay the reopening of religious or political events, which likewise can be conducted outdoors or virtually.

Since then, Governor Murphy has taken further action to relax closure restrictions but not with respect to movie theatres.  Executive Order No. 158 (June 29, 2020) paused the reopening of indoor dining in restaurants but allowed the other establishments permitted to reopen under Executive Order No. 157 to proceed.  Fithian Dec., Exh. K.

On July 2, 2020, Governor Murphy issued Executive Order No. 161, which increased the number of persons allowed at outdoor gatherings to 500, in light of the fact that the number of new COVID-19 cases in the State had remained steady for the preceding ten days.  Fithian Dec., Exh. L.  Religious and political gatherings were exempted from *any* limit on the number of people who may gather.

**D.     Defendants' Disparate Treatment of Movie Theatres.**

The Defendants have continued New Jersey's ban on reopening movie theatres in successive Executive Orders without a coherent explanation of how theatres differ from other places of public assembly, including other free speech gatherings, that the Defendants have allowed to reopen.  Executive Order No. 157 states that theatres "must remain closed to the public at this time, because those businesses necessitate a large number of individuals congregating together concurrently in one indoor location for an unusually prolonged period of time together in one single room or location."  Executive Order No. 157, at 4-5.  Whether or not these characteristics are more or less true than for "other recreational and entertainment businesses," they certainly apply to indoor religious and political gatherings Defendants permit. In some cases, Defendants' stated concerns apply with more force to religious or political gatherings.  For example, religious services of any length are permitted.  A Midnight Vigil or High Holiday service may be many times longer than a movie.  The difference in treatment enforced by Defendants is unexplained, inconsistent, and contrary to findings of public health authorities.

4821-4493-4849v.1

The federal Centers for Disease Control and Prevention ("CDC") treat the following "Large Venues" together for purposes of reopening: "sit-down dining, movie theaters, sporting venues, places of worship."[6]  Fithian Dec, Exh. N.  The CDC recommends that such venues be permitted to reopen at the same time, subject to social distancing requirements, as soon as any individual state or region meets certain gating criteria.  *Id.*  The Johns Hopkins University Center for Health Security has concluded that any differences between those venues from a public health standpoint mean that places of worship pose greater risks than movie theatres.  Fithian Dec., Exh. O.  Its findings were issued in a report advising Governors on how to manage health risks during the reopening.  *Public Health Principles for a Phased Reopening During COVID-19:  Guidance for Governors* ("Johns Hopkins Report").[7]

The Johns Hopkins Report concludes that places of worship are ***more risky*** vis-à-vis COVID-19 than "theaters, museums, and other indoor leisure spaces" because of differences in personal interactions at the respective venues.  It explains that theatres have ***medium*** "contact intensity," defined as a "function of contact type (ranging from close to distant) and duration (ranging from brief to prolonged)," while places of worship have ***high*** contact intensity.[8]  Unlike attendees at places of worship, movie theatre guests generally do not engage with those outside their immediate group to have conversations, hold or shake hands, hug, sing, provide verbal responses, do responsive readings, sit, stand and kneel frequently, share prayerbooks, or engage in other forms of contact common in places of worship.  Speaking and singing during the performance are not allowed in movie theatres (and, in fact, are actively discouraged).

---

[6] https://www.whitehouse.gov/openingamerica/

[7] https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopening-guidance-governors.pdf

[8] The Johns Hopkins Report found no difference in health risks comparing worship services and movie theatres in terms of "number of contacts" and "modification potential" (*i.e.*, "the degree to which mitigation measures can buy down [COVID-19] risks").

9

Additionally, in movie theatres there are no shared books or documents, frequent sitting, standing and kneeling, taking Communion or sharing Challah. Other public health experts have reached the same conclusion.[9] Fithian Dec., ¶ 27.

Consistent with the position of the federal government and the recommendations of public health experts, the overwhelming majority of states have already opened movie theatres, or are planning to do so by the end of this month. At least thirty-five states plus Puerto Rico have already allowed movie theatres to reopen on a state-wide basis. An additional eight states plus the District of Columbia have allowed movie theatres to reopen on a county or regional basis or with approval from the health department. An additional state is allowing movie theatres to reopen by July 31, 2020. One state has created a plan to allow movie theatres to reopen but has not announced a date. Fithian Dec. ¶ 38. Thus, movie theatres are expected to open in at least forty-five states plus the District of Columbia and Puerto Rico by July 31, 2020.

### E.    Movie Theatres Have Adopted Measures to Protect Public Health.

Before this suit was filed, representatives of Plaintiffs met with representatives of the Governor's office, and Plaintiffs presented detailed, comprehensive safety plans for the reopening of movie theatres in New Jersey that Plaintiffs are ready, willing, and able to implement. Fithian Dec., ¶ 31. The proposed protocols are more health-protective than the measures Defendants have required for the other indoor activities Defendants have permitted to reopen, such as churches, libraries and shopping malls. Plaintiffs' protocols meticulously address all aspects of theatre operations, including employees, patrons, ticket sales, concessions sales, seating, security, training, and other elements of health and safety. Fithian Dec., ¶ 32.

---

[9] Taylor DesOrmeau, *From Hair Salons to Gyms:  Experts Rank 36 Activities by Coronavirus Risk Levels*, MLive.com, June 2, 2020, https://www.mlive.com/public-interest/2020/06/from-hair-salons-to-gyms-experts-rank-36-activities-by-coronavirus-risk-level.html?outputType=amp

The comprehensive protocols Plaintiffs proposed to the Governor's office for the safe and healthy reopening of movie theatres in New Jersey include the following measures:

<u>As to Employees:</u>

- Masks and gloves required for all employees;

- Each employee to sign a document or otherwise certify each day upon the beginning of the shift that the employee does not have any symptoms associated with COVID-19 and that the employee does not have a fever;

- Each employee will be monitored regularly during the period the theatre is open, and any employee that becomes sick will immediately be sent home;

- Employees will be required to maintain social distancing in the workplace;

- All public spaces, restrooms, and food preparation areas will be cleaned, sanitized, and disinfected, in accordance with state and municipal department of health guidelines, NATO reopening operations resources, CDC COVID-19 reopening guidance, FDA Food Safety During Emergencies guidance, and OSHA Publication 3990, Guidance on Preparing Workplaces for COVID-19;

- Relevant areas and surfaces will receive continual cleaning during the hours the theatre is open and after closing;

- Employee break times will be staggered, and staff will maintain social distancing during breaks;

- Hiring will be conditioned on applicants signing a written certification that the potential employee has been symptom-free for 14 days prior to start date;

- Training will be provided to all employees on all COVID-19 policies prior to reopening and again when updates or changes are to be implemented;

As to Patrons:

- All patrons must wear masks;

- Seating patterns will be established to achieve social distancing;

- Ticketing, concessions, restroom, auditorium entrance, and other lines will maintain social distancing;

- Signs will be posted to indicate the social distancing and other safety rules;

As to Ticket Sales:

- Ticket sales will be limited to comply with any state rules limiting the occupancy of any auditorium or theatre venue;

- Touchless purchasing technology will be employed to the extent possible;

- For theatres lacking touchless capability, tickets will be purchased at designated locations where the employee and the patron will not have any physical contact and will maintain proper social distance;

- Plexiglas partitions will be employed at all customer service areas;

- Lines will be marked with measured six-foot increments to maintain proper social distancing, and patrons will be required to adhere to that spacing while waiting to conduct any transactions;

As to Concessions Sales:

- Queues will maintain physical distancing standards, patrons and employees will wear masks, and food service workers will wear gloves;

- Where possible, "apps" enabling pre-purchase of concessions will be employed and purchases will be delivered to patrons' seats, thus avoiding queue lines;

- Plexiglas contact partitions will be employed at all concessions areas;

4821-4493-4849v.1

- Staff will maintain standards of sanitization at all self-service and courtesy areas and other contact points;

As to Seating:

- Seating patterns will be arranged to maintain social distancing between households on all sides;

- Reserved seating ticketing systems will require empty seats on either side of a household's ticket purchase;

- If a theatre does not have a reserved seating policy, an usher or theatre manager will direct compliance with seating rules and monitor guests at routine intervals in order to maintain proper social distancing;

- Auditoriums will be cleaned between shows;

As to Security:

- Seating patterns will be arranged to maintain social distancing between households;

- Reserved seating ticketing systems will be updated, as described;

- Auditoriums will be cleaned between shows;

As to Training:

- All employees will be properly trained on safety and sanitizing procedures;

- Signs and placards will be placed in appropriate public areas reminding staff and patrons to adhere to safety policies, and proper markings on floors will be installed to assist in maintaining mandated physical distance levels;

- Signs will be posted outlining the policies and warning that, if not followed, the patron will be asked to leave the theatre;

- All safety policies will be posted on the theatre's website;

Other Health Precautions:

- Show times will be staggered to ensure capacity is controlled and sufficient time is allotted for entry and exit of patrons as well as cleaning the theatres;

- Additional hand sanitizer stations will be located throughout facilities;

- Facility HVAC system air exchangers will be calibrated to maximize replacement of indoor air with fresh air;

- Independent theatres with smaller lobby areas and other limited space and limited technology will make every effort to adhere to the guidelines outlined above; and

- Theatres and patrons will be required to follow all CDC Coronavirus Prevention Guidelines, New Jersey Department of Health requirements, and social distancing requirements established by the Governor.

Rather than address these comprehensive safety proposals in any meaningful way, Defendants have instead chosen to continue to discriminate against movie theatres and to continue to require the closure of indoor movie theatres.  Fithian Dec, ¶31.  The ostensible reason offered by Defendants, that there are an "especially high" number of "outdoor" and "virtual" ways to watch movies, will be addressed in Section IV.B., below.

The safety measures proposed by the Plaintiffs far exceed the precautions Defendants require for the other indoor venues Defendants have allowed to reopen.  Fithian Dec., ¶ 34,  For example, indoor religious gatherings merely must limit the number of attendees, require face coverings if 11 or more people are in attendance, limit physical contact for some attendees, mark six foot intervals for social distancing purposes, sanitize shared physical items under some circumstances, and provide contactless options for pre-payment or donations when feasible. Executive Order No. 152.

4821-4493-4849v.1

Likewise, the protocols Plaintiff have proposed far exceed those Defendants have imposed on indoor gatherings such as libraries, museums, and aquariums,[10] or shopping malls and retail establishments.[11]

### F.   Effect of the Executive Orders on Movie Theatres.

Movie theatres continue to suffer a total loss of revenue and profits since March 16, 2020 due to Defendants' shutdown orders. Exhibitors' Dec., ¶ 15. These losses increase each day and will continue to rise as summer 2020 continues. The movie exhibition industry is heavily dependent upon the summer movie-going season. Fithian Dec., ¶ 22. As a result of the ongoing forced closures, movie theatres are suffering considerable immediate and ongoing harm, including injuries to their businesses, reputations, and relationships with customers, vendors, and employees. The harm to reputation is substantial. Studies of consumer psychology show that consumers look to the pronouncements of government officials to evaluate the safety of certain activities in view of current conditions. One survey shows that 78% of consumers would require safety assurances from the health department before feeling comfortable to visit a movie theatre

---

[10] Libraries, museums, and aquariums are merely required to limit the number of patrons, provide that reservations, cancellations, and prepayments be made via electronic or telephone reservation systems, require a physical barrier between visitors and employees where feasible or otherwise provide for six feet of distance except when paying, limit rented equipment to use by one household at a time, mark six feet of spacing in common areas and lines, require handwashing, coughing/sneezing etiquette and proper tissue usage and disposal, provide hand sanitizer and wipes to employees and customers, limit occupancy of restrooms, require frequent sanitization of high-touch areas, limit person-to-person interactions, send home workers with symptoms of COVID-19, notify workers of any known exposure to COVID-19, clean and disinfect the worksite in accordance with CDC guidance, follow New Jersey Department of Health, CDC and OSHA guidelines, and require workers and customers to wear face coverings except where "impracticable." Executive Order 157.

[11] Retail establishments and shopping malls merely must limit the number of patrons, reserve certain hours for shopping by high-risk customers, require a physical barrier between visitors and employees where feasible or otherwise provide for six feet of distance except when paying, require handwashing, coughing/sneezing etiquette and proper tissue usage and disposal, provide break time for handwashing, arrange for contactless pay options where feasible, provide hand sanitizer and wipes to staff and customers, require frequent sanitization of high-touch areas, place signs reminding to keep six feet distance, mark six feet of distance in lines, and require workers and customers to wear cloth face coverings. Executive Order 157.

4821-4493-4849v.1

in light of COVID-19.[12]  Here, Defendants are communicating exactly the opposite message to the movie-going public.  Finally, and perhaps most importantly, the damage to Plaintiffs' rights to free speech and expression and to equal protection under the law is incalculable.  Defendants have not provided or offered any compensation to New Jersey's movie theatres in exchange for the regulatory taking of their properties.  Exhibitors' Dec., ¶ 17.

## III.    LEGAL STANDARD

A temporary restraining order should issue if "immediate and irreparable injury, loss, or irreversible damage will result" to the applicant if the order does not issue.  Fed. R. Civ. P. 65(b).  The Court considers the following factors when ruling on an application for a temporary restraining order:  "(1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest."  *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (reversing denial of preliminary injunctive relief) (citations omitted).  These factors demonstrate that a restraining order is required here.

## IV.    ARGUMENT

### A.    The Power to Enact Public Health Laws Is Subject to Constitutional Limitations

The Executive Orders at issue are an exercise of the police power, and courts have long recognized that states have significant authority to "enact quarantine laws and health laws."  *Jacobson v. Mass.*, 197 U.S. 11, 25 (1905); *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016).  For equally as long, however, courts have cautioned that this power cannot be exercised in "an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public" that courts must intervene when such orders threaten to violate

---

[12] *America Approaches An Inflection Point*, at p.13, www.engagious.com.

constitutional rights. *Jacobson*, 197 U.S. at 28, 38. *See Hickox*, 205 F. Supp. 3d at 592-93 ("A restriction can be so arbitrary or overbroad as to be impermissible."). In this connection, quarantine orders that are discriminatory or a violation of equal protection are unconstitutional. *E.g.*, *Jew Ho v. Williamson*, 103 F. 10, 26 (C.C.D.Cal. 1900) (sealing off an entire section of San Francisco to prevent the spread of the bubonic plague was "unreasonable, unjust, and oppressive"), cited with approval by *Hickox*, 205 F. Supp. 3d at 592. Likewise, content-based COVID-19 restrictions on free expression violate both the Equal Protection Clause and the First Amendment. *First Baptist Church v. Kelly*, 2020 WL 1910021, at *7 (D. Kan. Apr. 18, 2020) (granting temporary restraining order against COVID-19 closure orders, where the "orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral"), *motion to modify restraining order denied*, 2020 WL 1984254 (D. Kan. Apr. 27, 2020). *See also Camelot Banquet Rooms, Inc. v. U.S. S.B.A*, 2020 WL 2088637 (E.D. Wis. May 1, 2002) (discussed below, invalidating on Equal Protection and First Amendment grounds a provision of COVID-19 relief act, Payroll Protection Program, that discriminated based on favoring some speech over other speech).[13]

While Defendants' initial orders closing all indoor public assemblies were neutral, their subsequent actions were not. In the reopening process, Defendants have deliberately prioritized

---

[13] In connection with states' response to the current COVID-19 situation, courts have only upheld restrictions on expressive activity that are facially neutral. *E.g., South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613 (2020) (rejecting First Amendment challenge to church closure order because "[s]imilar or more severe restrictions apply to comparable secular gatherings, including . . . movie showings"); *Cross Culture Christian Center v. Newsom*, 2020 WL 2121111, at *6 (E.D. Cal. May 5, 2020) (rejecting free exercise challenge to California's closure of churches because "all comparable assemblies are completely prohibited"); *McCarthy v. Cuomo*, 2020 WL 3286530, at *4 (E.D. N.Y. June 18, 2020) (rejecting First Amendment challenge to orders closing strip clubs, reasoning that New York's "COVID-19 Executive Orders are content neutral. . . . [and] broadly prohibit large gatherings, without regard for the content of the expression occurring at those gatherings."). *Cf. Altman v. County of Santa Clara*, 2020 WL 2850291, at *12 (N.D. Cal. June 2, 2020) (rejecting Second Amendment challenge to closure of firearms retailer on the ground that the closure order "is facially neutral").

certain types of places of public assembly over movie theatres based on the Defendants' preference for the message presented (religious and political) over artistic or cultural.  Some of the forums that have been allowed to reopen present one type of message (religious institutions and political activities) and others are purely commercial establishments (for example, shopping malls).   Whereas the Governor reopened indoor religious services in early June—and then increased occupancy limits for religious services a week later—he has failed to even provide a timeline for reopening movie theatres.  Defendants' arbitrary difference in treatment lacks any logical basis—and is supported in the public record only by the flippant and conclusory suggestion that consumers can watch movies at home.  Compounding their constitutional error, Defendants' orders openly favor certain speakers over others.

As a consequence, many movie theatres in New Jersey are on the brink of economic ruin, with Plaintiffs' rights to equal protection and freedom of speech violated in the process. Exhibitors' Dec., ¶¶ 15-17.  The ongoing harm to Plaintiffs is immediate, manifest, and irreparable, and given Defendants' refusal to change course, can only be remedied by a restraining order and injunction.

> **B.**     **Plaintiffs Are Likely to Succeed on the Merits**
>
> **1.**     **Defendants' Orders Violate the Equal Protection Guarantee of the United States Constitution and Article I, ¶ 1 of the New Jersey Constitution.**

"The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  Defendants' orders plainly fail to treat movie theatres like other "similarly circumstanced" places of public assembly.  The Supreme Court just a month ago recognized that churches and movie theatres are similar places of assembly for purposes of COVID-19 risk.  *South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613 (May 29, 2020) (noting that religious services are "comparable" to "secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical

performances").  Regardless of whether the Court subjects Defendants' orders to strict scrutiny or rational basis review, Defendants' orders violate the Fourteenth Amendment and Article I, Paragraph 1 of the New Jersey Constitution.

### a. Defendants' Conduct Infringes Plaintiffs' Fundamental Right to Free Speech, Requiring Strict Scrutiny.

"The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises.  Thus [the Supreme Court has] treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'"  *Plyler*, 457 U.S. at 216-17.  Where a "fundamental right" such as free speech is at issue, "it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest."  *Id.* at 217.  In this regard, the courts have found that Equal Protection and First Amendment claims are often intertwined.  *Arkansas Writers Project v. Ragland*, 481 U.S. 221, 227 n.3 (1987); *News America Pub. Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988) ("claims lie at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons").

The Executive Orders at issue in this case that treat movie theatres less favorably than other venues clearly implicate the First Amendment.  Movie theatres and motion pictures are "included within the free speech and free press guaranty of the First and Fourteenth Amendments," *Joseph Burstyn, Inc.*, 343 U.S. at 502, and the Constitution protects "the production, distribution and exhibition of films and other forms of entertainment." *Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 218 (3d Cir. 1988).  Constitutional protections for film – whether it involves fiction or non-fiction – are every bit as strong as for political or religious

19

speech.[14]  Accordingly, "[t]he administration of a censorship system for motion pictures presents peculiar dangers to constitutionally protected speech." *Freedman v. Maryland*, 380 U.S. 51, 57 (1965).

In cases like this, courts apply strict scrutiny to differential treatment by the government. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983); *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 99, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."); *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951) ("The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body.").   To survive strict scrutiny the government must prove that its differential treatment of movie theatres in the reopening orders is necessary to serve a compelling governmental interest and that it has employed the least restrictive means of serving a legitimate purpose.  *United States v. Playboy Entm't Grp. Inc.*, 529 U.S. 803, 813 (2000).

Here, the State's justification founders at the threshold, because favoring some speakers over others based on the government's judgment that "religious services and political activity … are particularly important" is not a legitimate interest.[15]  "[A]bove all else, the First Amendment

---

[14] Movies "are a significant medium for the communications of ideas" that "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc.*, 343 U.S. at 501.  *See Hart v. Electronic Arts, Inc.*, 717 F.3d 141, 173 (3d Cir. 2013) ("The First Amendment extends protection to biographies, documentaries, docudramas, and other expressive works depicting real-life figures, whether the accounts are factual or fictional.").

[15] The Governor's brazenness about his preference for religious and political speech over artistic and cultural speech illustrates why the Executive Orders violate the Equal Protection Clause.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) ("in equal protection cases," courts "may determine the [government's] object from both direct and circumstantial evidence.  Relevant evidence includes, among other things, . . . contemporary statements made by members of the decision making body.").

means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95. "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 461, 648-649 (1987). "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). *See also Playboy Entm't Grp.*, 529 U.S. at 818 (judgments about the relative importance of speech "are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.").[16]

In *Camelot Banquet Rooms, Inc. v. U.S. S.B.A*, 2020 WL 2088637 (E.D. Wis. May 1, 2002), the court enjoined the Small Business Administration on both Equal Protection and First Amendment grounds from excluding nude dance clubs from receiving Payroll Protection Program ("PPP") loans because a content-based exclusion served no legitimate governmental purpose:

> The obvious flaw in the government's reasoning is that it has chosen to remove the COVID-19 obstacle from the path of nearly every other small business in the United States. In leaving the obstacle in the plaintiffs' path, the government has singled them out for unfavorable treatment based solely on the content of their speech. Moreover, the government has not articulated any legitimate governmental interest that might be served by excluding the plaintiffs from the PPP. As explained below, in the cases on which the government relies, the Supreme Court allowed Congress to make content-based distinctions in its funding programs only when those distinctions were either related to the purpose of the funding program or were rationally related to another legitimate governmental interest. Here, the purpose of the funding program is to make favorable loans to all small businesses to help them survive the economic crisis brought on by the COVID-19 pandemic. The funding program has no "message," and the government cannot point to any legitimate purpose that would be served by denying the plaintiffs access to the program. Thus, the Constitution does not

---

[16]   *U.S. v. Stevens*, 559 U.S. 460, 479 (2010) ("*Most* of what we say to one another lacks "religious, political, scientific, educational, journalistic, historical, or artistic value" (let alone serious value), but it is still sheltered from government regulation.") (emphasis in the original).

permit the SBA to exclude the plaintiffs from the PPP based on the content of their speech.

Even if the State could justify its discriminatory treatment as related to some legitimate interest, the restrictions on movie theatres are <u>not</u> "narrowly tailored to their legitimate objectives." *Mosley*, 408 U.S. at 101.

***First***, if the supposed justification for keeping movie theatres closed while churches, libraries, and shopping centers are allowed to open is that "large" number of people gather for "prolonged" periods of time, there are obviously less restrictive and more narrowly tailored means available to Defendants.  Defendants can simply apply the same limit on occupancy (a percentage of normal seating capacity) as it has imposed on churches, libraries, and malls.  But banning all movie audiences, not matter how small, is not narrowly tailored or the least restrictive means to an end.  And Defendants have applied no time limits at all to religious or political gatherings.

***Second***, as described above, Plaintiffs are prepared to implement a program of safety protocols that is much more comprehensive—and more stringent—than the Governor's guidelines for the safe operation of places of worship, libraries, and shopping malls.  Fithian Dec., ¶¶ 32-34.  Leading public health authorities, including the CDC, hold that movie theatres present a similar risk profile to places of worship, and should be permitted to reopen at the same time.  Fithian Dec., Exh. N.  The Johns Hopkins Report explains that places of worship are more risky than "theaters, museums, and other indoor leisure spaces."  Fithian Dec., Exh. O.[17]

---

[17]   It makes sense that movie theatres present fewer risks than, in particular, indoor religious services.  Unlike attendees at places of worship, movie theatre guests generally do not engage with those outside their immediate groups to have conversations, hold or shake hands, hug, sing, provide verbal responses, do responsive readings, or engage in other forms of contact regularly engaged in at places of worship.  Significantly, speaking and singing are not allowed in movie theatres during the performance.  Nor are there shared books or documents or frequent sitting, standing and kneeling in movie theatres.  Fithian Dec., ¶ 27.

*Third*, nothing in the public record indicates Defendants even attempted to tailor their orders to their objective of controlling the spread of COVID-19, much less that they did so narrowly.  Defendants' entire public justification for keeping movie theatres closed is the glib suggestion that movie theatres do not need to be open, because members of the public have an "especially high" number of means to watch movies outdoors or virtually.  Executive Order NO. 157.  To begin with, this purported justification is not correct.  There is only <u>one</u> drive-in theatre in all of New Jersey, certainly not an "especially high" number.   Piechota Dec, ¶ 21. Furthermore, only a small number of the movies scheduled to appear in theatres have been offered online, and even then, only to those who subscribe to the relevant streaming service. Fithian Dec., ¶ 24.

*Fourth,* even if true, this explanation is constitutionally deficient.  The State lacks any authority to close off a normal venue for expression based on the assertion there are other ways to communicate.  *Schneider*, 308 U.S. at 163; *Virginia Bd. of Pharmacy*, 425 U.S. at 757 n.15. Any such suggestion is frivolous.  The Governor's claim that because the public can watch Movie A online (or at New Jersey's sole drive-in theatre) he may forbid the exhibition of Movies B, C, D, and E.  This is the equivalent of claiming the government can suppress all public events of Political Party A because it has chosen to allow the public rallies of other political parties.

The Governor's rationale for keeping movie theatres closed—that supposedly there are "virtual" and "outdoor" viewing options—applies equally to religious services, libraries, and shopping malls.  One need not be physically present in a church, temple, mosque, or synagogue to engage in acts of prayer or worship.  Nor must one be present in a library to read, or visit a shopping mall in order to shop.  Yet places of worship, libraries, and malls are all open to the public, whereas Defendants have not even set a timeline for reopening movie theatres.

**b.**  **Defendants' Orders Cannot Withstand Even Rational Basis Review.**

Defendants' orders are invalid even under rational basis scrutiny.  The Supreme Court "has recognized successful equal protection claims . . . where the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (holding landowner stated equal protection claim against municipality on the basis of selective enforcement of easement regulations); *see also Chavarriaga v. New Jersey Dept. of Corr.*, 806 F.3d 210, 233-34 (3d Cir. 2015) (holding equal protection claim stated by prisoner "where it reasonably could be inferred that prison personnel targeted her intentionally without a legitimate penological basis").

*First*, Defendants' disparate treatment of movie theatres is unquestionably intentional and is based on the government's stated preference for other speakers, not on discernable public health distinctions.  Defendants issued a series of orders specifically allowing places of worship, libraries, and shopping malls to reopen to the public, while expressly keeping movie theatres closed.  Fithian Dec., Exhs. A-L

*Second*, Defendants' differential treatment of movie theatres lacks a logical explanation. The only basis Defendants have offered is the Governor's suggestion that consumers can watch *some* movies "outdoors" or "virtually," implying that such alternatives are not available in connection with places of worship, libraries, and shopping malls that have been allowed to reopen.  Fithian Dec, ¶ 23.  But they are.

As explained above, Defendants' orders fail to provide any rationale based on health risks.  Movie theatres present a risk profile lower than places of worship do, and movie theatres are prepared to implement comprehensive safety protocols that exceed those required by Defendants for the operation of indoor religious services and other places of assembly.  In fact,

many churches lacking a building of their own, or lacking the capability to safely host religious services during this period, hold their religious services in movie theatres, for example, the Cinemark Theatre Church program.   Under Defendants' orders, a movie theatre could host religious services on Sunday morning but would have to close for purposes of showing movies on Sunday afternoon.   As another example, a church group could watch a religiously-themed movie in a movie theatre as part of its religious services but the same theatre cannot show the same film to a general audience of the same size that same day.

> **2.    Defendants' Orders Violate Freedom of Speech Guaranteed by the First Amendment and New Jersey Constitution, Article I, ¶ 6.**

Defendants' orders operate as a blanket prior restraint on the operation of movie theatres throughout the state of New Jersey.   Closing down an entire venue of communications by official decree is the very definition of a prior restraint.   As the Supreme Court has emphasized in an unbroken line of precedent, any governmental action that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official … is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969); *FW/PBS v. City of Dallas*, 493 U.S. 215, 226 (1990).   Prior restraints constitute "the essence of censorship," *Near v. Minnesota*, 283 U.S. 697, 713 (1931), and "the most serious and the least tolerable infringement on First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 51, 57 (1965).  "[A]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

Prior restraints on speech can take many forms, including injunctions barring publication, *Near*, 283 U.S. at 713, licensing requirements, *FW/PBS*, 493 U.S. at 226, film review boards, *Freedman*, 381 U.S. at 55, or even threats of official reprisals.  *Bantam Books,* 372 U.S. 70.  All are suspect under the First Amendment, but the principal constitutional deficiency they share is a

lack of legal process to cabin official discretion.  Such restrictions on protected speech are rarely tolerated, and they survive scrutiny only when they place the burden of justifying any censorship on the government, include adequate procedural safeguards, and require the government to make a prompt decision about whether speech is to be allowed.  *E.g.*, *FW/PBS*, 493 U.S. at 226; *Freedman*, 381 U.S. at 59.  In particular, any system that fails to place limits on the time for making a decision is impermissible.  *Id.  See Vance v. Universal Amusement Co.*, 445 U.S. 308 (1980) (striking statute on ground that it restrained speech for an "indefinite duration").

The Executive Orders at issue here fail on every aspect of this analysis.  Even if the restriction on reopening theatres were content-neutral, leaving this decision to "the uncontrolled will of an official" is constitutionally indefensible.  *Shuttlesworth*, 394 U.S. 151.  Defendants have not attempted to meet any burden of proof to justify the continued closure, there is no legal process (other than in this court) to challenge their decision, and there is no timetable of any kind for obtaining relief.  The continued censorship of movie theatres is unconstitutional and must be enjoined.

### C.    Plaintiffs Are Suffering Irreparable Harm.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996) (quoting 1A Charles A. Wright, Arthur R. Miller & Mary Kane, *Federal Practice & Procedure* § 2948.1 at 161 (2d ed. 1995)); *see Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (irreparable harm is generally presumed where the moving party's freedom of speech right is being infringed).  It is well-established that, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Beyond the harm to constitutional rights, a "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury."  *Doran v. Salem Inn,*

*Inc.*, 422 U.S. 922, 932 (1975).  "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

Defendants' orders requiring the entire movie theatre industry in New Jersey to remain closed for nearly four months and with no end in sight is causing an existential crisis for the movie theatre industry in the State.  Plaintiffs have suffered an ongoing and complete loss of revenue and profits since mid-March 2020.  Plaintiffs continue to suffer severe, irreparable harm as a consequence of the orders challenged in this lawsuit—harm arising both from the core constitutional violations and from the economic consequences of those violations.  These losses increase each day and will continue to rise as summer 2020 progresses.  Exhibitors' Dec., ¶ 13-17.

The movie exhibition industry is heavily dependent upon the summer movie-going season.  Fithian Dec., ¶ 22.  As a result of the ongoing government-required closures, movie theatres are suffering considerable and ongoing harm, including injuries to their businesses, reputations, and relationships with customers, vendors, landlords, and employees.  Fithian Dec., ¶¶ 13-17.

Defendants cannot realistically contest Plaintiffs' showing of irreparable harm.

**D.     The Balance of Equities and Public Interest Favor Plaintiffs.**

In the Third Circuit "we consider together the final two elements of the preliminary injunction framework—the public interest and the balance of the equities." *Minard Run Oil Co. v. U.S. Forest* Service, 670 F.3d 236, 256 (3d Cir. 2011).  This is because "assessing the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009)

There is a "strong public interest in obtaining compliance with the equal protection clause of the constitution."  *Spangler v. U.S.*, 415 F.2d 1242, 1246 (9th Cir. 1969).  Similarly, "the

public interest is always served in promoting First Amendment values." *TD Bank N.A. v. Hill*, 928 F.3d 259, 285 (3d Cir. 2019) (quoting *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001)); *see Able v. U.S.*, 847 F. Supp. 1038, 1045 (E.D.N.Y 1994) ("The preservation of rights of free speech and equal protection" are matters of "public interest."); *Odebrecht Const., Inc. v. Secretary, Fla. Dept. of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("the State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute.").

Defendants' orders not only discriminate against Plaintiffs' businesses, they restrict Plaintiffs'—and the movie going public's—rights to freedom of speech and assembly. This ongoing infringement of Plaintiffs' constitutional rights is contrary to the public interest.

The economic consequences of Defendants' orders add another layer of adverse impact to the public interest. Plaintiffs have been forced to lay off, furlough or reduce the hours of their employees. Exhibitors' Dec., ¶ 15. The prospect of movie theatre closures throughout the State would result in permanent job losses and the erosion of the State's cultural fabric. *Zamboni v. Stamler*, 847 F.2d 73, 81 (3d Cir. 1988) (recognizing "the public interest in employment stability"); *In re Inter-Op Hip Prosthesis Liability Litig.*, 204 F.R.D. 330, 358 (N.D. Ohio 2001) (recognizing the "public interest to avoid" severe economic consequences to a party).

Weighed against these consequences, Defendants would suffer no hardship if simply required to treat movie theatres the same as indoor religious services, libraries, and shopping malls. Any marginal increase in the net risks to public safety is addressed by the comprehensive safety protocols Plaintiffs stand ready to implement. Exhibitors' Dec., ¶ 8; Fithian Dec., ¶ 33. Defendants have already demonstrated their willingness to allow activities with similar—actually greater—risk profiles to reopen to the public. Fithian Dec, Exhs. N, O. Plaintiffs only ask to be treated the same as the other places of public assembly. Defendants will suffer no harm—let alone irreparable harm—by providing equal treatment under the law.

## V.    CONCLUSION

In summary, Plaintiffs acknowledge the serious public health consequences of COVID-19.  Plaintiffs are not seeking through this lawsuit any kind of special treatment.  To the contrary, they are only seeking to be treated the same as the other places of public assembly that Defendants have already allowed to reopen, and to exercise their rights of free speech and expression.

For the reasons explained above, Plaintiffs respectfully ask the Court to issue a temporary restraining order against Defendants' orders to the extent they require movie theatres to remain closed while churches, libraries, and shopping centers are allowed to be open.

Dated: New York, New York          Respectfully Submitted,
           July 13, 2020.

                                   DAVIS WRIGHT TREMAINE LLP


                                   By: */s/ Geoffrey S. Brounell*
                                   Geoffrey S. Brounell (member of the D.N.J. bar)
                                   Robert Corn-Revere (admitted *pro hac vice*)
                                   Janet Grumer (admitted *pro hac vice*)
                                   Martin L. Fineman (admitted *pro hac vice*)
                                   John D. Freed (admitted *pro hac vice*)

                                   1251 Avenue of the Americas, 21st floor
                                   New York, New York  10020
                                   Telephone:  (212) 489-8230
                                   geoffreybrounell@dwt.com
                                   bobcornrevere@dwt.com
                                   janetgrumer@dwt.com
                                   martinfineman@dwt.com
                                   jakefreed@dwt.com

                                   Attorneys for Plaintiffs National Association of Theatre Owners, National Association of Theatre Owners of New Jersey, American Multi-Cinema, Inc., Cinemark USA, Inc., Regal Cinemas, Inc., BJK Entertainment Inc., Bow Tie Cinemas, LLC, and Community Theaters LLC