**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF THEATRE OWNERS; NATIONAL ASSOCIATION OF THEATRE OWNERS OF NEW JERSEY; AMERICAN MULTI-CINEMA, INC.; CINEMARK USA, INC.; REGAL CINEMAS, INC; BJK ENTERTAINMENT INC.; BOW TIE CINEMAS, LLC; and COMMUNITY THEATERS LLC, | Case No. 3:20-cv-8298 (BRM) (TJB) |
| Plaintiffs, | |
| v. | **OPINION** |
| PHILIP D. MURPHY, in his official capacity as Governor of New Jersey; and JUDITH PERSICHILLI, in her official capacity as Acting Commissioner of Health of New Jersey, | |
| Defendants. | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiffs National Association of Theatre Owners ("NATO"); National Association of Theatre Owners of New Jersey ("NATO NJ") (collectively, the "NATO Plaintiffs"); American Multi-Cinema, Inc. ("AMC"); Cinemark USA, Inc. ("Cinemark"); Regal Cinemas, Inc. ("Regal"); BJK Entertainment Inc. ("BJK"); Bow Tie Cinemas, LLC ("Bowtie"); and Community Theaters LLC's ("Community Theaters") (collectively, the "Exhibitor Plaintiffs") (with the NATO Plaintiffs, "Plaintiffs") Motion for Preliminary Injunction (ECF No. 21), filed on July 14, 2020, seeking to enjoin Defendants Philip D. Murphy ("Governor Murphy") and Judith Persichilli ("Commissioner Persichilli") (collectively, "Defendants") from "applying or enforcing

any [e]xecutive [o]rders (including, without limitation, Executive Order No. 157), or other actions, against movie theatres, requiring their closure, or imposing different terms for opening to the public than those imposed upon religious or political indoor gatherings." (ECF No. 21-1 at 1–2.) Defendants oppose Plaintiffs' Motion. (ECF No. 26.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on August 5, 2020.[1] (ECF No. 35.) Having reviewed the submissions filed in connection with the Motion and having heard the arguments of the parties, for the reasons set forth below and for good cause appearing, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

I.   BACKGROUND

A.      COVID-19 and New Jersey's Economic Shutdown

This action arises out of the State of New Jersey's—through Governor Murphy and Commissioner Persichilli—response to the COVID-19 pandemic. On March 4, 2020, Governor Murphy announced the state's first presumptive-positive case of coronavirus.[2] Since then, the state has recorded 187,767 cases and 14,077 deaths.[3] Indeed, "[t]hese are the times that try men's souls." Thomas Paine, *The American Crisis* I (1776).

On March 9, 2020, Governor Murphy declared a public health emergency and a state of emergency.[4] One week later, on March 16, 2020, Governor Murphy issued Executive Order 104

---

[1] The Court delayed publication of this Opinion while the parties engaged in settlement discussions with the Honorable Tonianne J. Bongiovanni, U.S.M.J.

[2] Attrino, Anthony G., *N.J. coronavirus update: Fort Lee man, 32, is first to test positive for virus in state*, N.J. Advance Media (Mar. 5, 2020), https://www.nj.com/coronavirus/2020/03/nj-coronavirus-update-fort-lee-man-32-is-first-to-test-positive-for-virus-in-state.html

[3] State of New Jersey Department of Health, *New Jersey COVID-19 Dashboard*, https://nj.gov/health/cd/topics/covid2019_dashboard.shtml (last visited Aug. 18, 2020).

[4] N.J. Exec. Order. 103 (Mar. 9, 2020).

("EO 104"), which mandated the closure of all recreational facilities, amusement centers, shopping malls, bars and restaurants (except for take-out and delivery services), and gyms and fitness centers. N.J. Exec. Order 104 (Mar. 16, 2020). Further, on March 21, 2020, Governor Murphy issued Executive Order 107 ("EO 107"), which superseded EO 104 and included two main components. First, the order required all New Jersey residents to remain home unless they were leaving for any of the enumerated reasons. N.J. Exec. Order 107 (Mar. 21, 2020). Second, EO 107 mandated the closure of all retail businesses, save for certain "essential" retail stores including pharmacies, grocery stores, and medical supply stores. *Id.* Specifically excluded from the list of "essential" business were "recreational and entertainment businesses," which included theaters and cinemas. *See id.* None of Governor Murphy's executive orders mandated the closure of churches.[5,6] EO 107 also strictly limited the number of persons who could participate in a gathering—for any purpose—to ten people. *Id.*

### B.   New Jersey's Economic Reopening

On May 18, 2020, Governor Murphy announced "New Jersey's Road Back Plan"—a plan designed to gradually reopen the state to prevent a resurgence of the virus. (ECF No. 21-3, Ex. C.) The plan describes a series of reopening "stages"—beginning with what Defendants deem to be low-risk activities and advancing toward what Defendants deem to be higher-risk activities. (*See id.*) Since then, New Jersey has moved through "Stage 1" to "Stage 2" of the reopening roadmap. In that time, through a series of executive orders, Governor Murphy has allowed the reopening of

---

[5] The Court as well as the parties use the term "churches" to refer generally to all houses of worship.

[6] Because Defendants never closed churches, Plaintiffs argument regarding Defendants' inconsistent positions over the closure of churches is of no moment. (*See* Unofficial Transcript of August 5, 2020 Oral Argument ("Tr.") at 6:13–21.)

outdoor premises including state parks, outdoor recreational and entertainment businesses, and outdoor service for bars and restaurants. *See, e.g.*, N.J. Exec. Orders 142 (May 13, 2020), 150 (June 3, 2020), and 153 (June 9, 2020).

Furthermore, Governor Murphy has allowed the reopening of several indoor businesses. On June 3, 2020, Governor Murphy issued Executive Order 150 ("EO 150") authorizing the opening of "brick-and-mortar premises of non-essential retail businesses," subject to capacity and sanitization limits, effective June 15, 2020. N.J. Exec. Order 150 ¶ 8. Additionally, on June 13, 2020 Governor Murphy issued Executive Order 154 ("EO 154"), which permitted personal care service facilities to open as of June 22, subject to health and safety standards issued by the New Jersey Department of Health. N.J. Exec. Order 154 (June 13, 2020). On June 26, 2020, Governor Murphy issued Executive Order 157 ("EO 157"), which allowed the reopening of indoor operations of certain recreational and entertainment businesses, restaurants, and bars—subject to even stricter capacity limitations and mask mandates than what was required for indoor retail businesses. N.J. Exec. Order 157 (June 26, 2020).[7] In so doing, Governor Murphy highlighted the differences between the COVID-19 transmission risk at indoor retail operations as compared to indoor entertainment venue operations, stating:

> [B]ecause indoor dining and indoor recreational and entertainment businesses also both entail a higher risk than indoor retail settings, as the former involves individuals congregating together in one location for a prolonged period of time, while in indoor retail settings, individuals neither congregate in large groups nor remain in close proximity for extended periods and so the risk of COVID-19 spread is reduced, it is also appropriate to impose stricter capacity limits on indoor dining and indoor recreational and entertainment businesses than are currently imposed on indoor retail setting.

---

[7] Despite initially allowing the re-opening of bars and indoor dining, Governor Murphy indefinitely paused the re-opening via Executive Order 158, citing a spike in COVID-19 cases in states that had previously re-opened such establishments. *See* N.J. Exec. Order 158 (June 29, 2020).

N.J. Exec. Order 157 (June 26, 2020).

Governor Murphy affirmed the continued closure of certain indoor entertainment premises, including "performance-based locations such as movie theaters, performing arts centers, and other concert venues." *Id.* at 4–5. Specifically, in his reasoning for the continued closure, Governor Murphy stated (1) "such businesses necessitate a large number of individuals congregating together concurrently in one indoor location for an unusually prolonged period of time, even more so than in other recreational and entertainment businesses"; and (2) "there are an especially high number of available outdoor and virtual options for members of the public to view and listen to movies and other performances." *Id.*

In addition to relaxing limits on business closures, Governor Murphy relaxed the limits on the number of people allowed to gather at both indoor and outdoor premises. For indoor spaces, Governor Murphy set a limit of 25 percent of a room's total capacity or 100 persons (whichever is lower) and required all persons to be wearing masks. *See* N.J. Exec. Order 152 (June 9, 2020). For outdoor spaces, Governor Murphy set the limit at 500 people, with political protests and religious services being exempt from this restriction. *See* N.J. Exec. Order 161 (July 2, 2020). However, given the rising number of confirmed COVID-19 cases in New Jersey, on August 3, 2020, Governor Murphy issued Executive Order 173 ("EO 173") which lowered the indoor gathering limit from 100 people to 25 people. *See* N.J. Exec. Order 173 (Aug. 3, 2020). Exempt from this limit are "religious services or celebrations, political activities, wedding ceremonies, funerals, and memorial services." *Id.* at 5.

### C.     Parties

#### 1.     The NATO Plaintiffs

NATO is a voluntary membership, non-profit organization of movie theater owners throughout the United States and abroad. (ECF No. 21-2 at 10.) It represents over 35,000 movie screens around the world, and its membership includes owners of movie theaters throughout New Jersey that are affected by Governor Murphy's executive orders. (*Id.*)

NATO NJ is also a voluntary membership, non-profit organization of movie theater owners, operators, executives, and managers throughout New Jersey. (*Id.*) NATO NJ's purpose is to provide its members with advice and guidance and to promote the welfare of New Jersey's movie theaters. (*Id.*)

#### 2.     The Exhibitor Plaintiffs

The remaining Plaintiffs are a group of movie theater companies that show movies in New Jersey. (*Id.* at 11.) BJK, Bow Tie, and Community Theaters each own from one to five theaters in New Jersey, while AMC, Cinemark, and Regal are the three largest movie theater chains in the country and own many theaters throughout the State. (*Id.*) Each Exhibitor Plaintiff is a member of both NATO and NATO NJ. (*Id.*)

#### 3.     Defendants

Philip D. Murphy is the Governor of New Jersey and Judith Persichilli is the New Jersey Acting Commissioner of Health. (*Id.*) Defendants issued the orders challenged herein. (*Id.*)

### D.     Movie Theaters' Proposed Health and Safety Measures

Prior to the filing of this suit, representatives of Plaintiffs met with representatives of the Governor's Office to present comprehensive safety plans for the reopening of movie theaters in New Jersey. (ECF No. 21-2 at 17.) Plaintiffs contend these proposed protocols are "more

health-protective" than the measures Defendants have required for "other indoor activities" that have been allowed to reopen. (*Id.*) Specifically, Plaintiffs' comprehensive protocols address many aspects of theater operations, "including employees, patrons, ticket sales, concessions sales, seating, security, training, and other elements of health and safety." (*Id.*)

### 1.   Employee Protocols

Plaintiffs propose that masks and gloves be required for all employees. (*Id.* at 18.) Additionally, each employee will be required to sign a document each day certifying they do not have symptoms associated with COVID-19. (*Id.*) Employees will be required to maintain social distancing at all times, which will be aided by staggered employee break times. (*Id.*) Relevant areas and surfaces—including all public spaces, restrooms, and food preparation areas—will be cleaned, sanitized, and disinfected in accordance with state, municipal, and Centers for Disease Control and Prevention ("CDC") guidelines throughout operating hours and after closing. (*Id.*)

### 2.   Patron Protocols

Plaintiffs will require all patrons to wear masks. (*Id.* at 19.) Seating patterns will be established to achieve social distancing among the patrons. (*Id.*) Persons in line for ticketing, concessions, restrooms, entrances, and other lines will be required to maintain social distancing. (*Id.*) Plaintiffs will post signs to indicate these rules to patrons. (*Id.*)

### 3.   Ticket Sales Protocols

Plaintiffs propose that ticket sales be limited to comply with any state rules limiting the indoor capacity of theaters and that theaters will implement electronic touchless ticket purchasing to the greatest extent possible. (*Id.* at 20.) Further, Plexiglas partitions will be installed at all customer service areas, and lines will be marked with measured six-foot increments to help patrons maintain social distancing. (*Id.*)

### 4.    Concession Sales Protocols[8]

Patrons in concession sales lines will be required to maintain social distancing standards, and food service workers will be required to wear gloves. (*Id.*) Furthermore, Plaintiffs will employ "apps" to allow patrons to have concessions delivered to their seats. (*Id.*) Finally, Plexiglas partitions will be used at concessions areas. (*Id.*)

### 5.    Seating Protocols

Plaintiffs propose seating patterns that will maintain social distancing between households, which would require empty seats on either side of a household's ticket purchase. (*Id.* at 20.) Further, ushers or managers will monitor guests to ensure patrons are maintaining social distancing guidelines. (*Id.*) Finally, all auditoriums will be cleaned between shows. (*Id.*)

### 6.    Training Protocols

Plaintiffs will require that all employees will be properly trained on the above safety and sanitation measures. (*Id.*) Additionally, signs and placards will be posted in appropriate areas reminding staff and patrons to adhere to the safety policies and informing patrons that they will be asked to leave the theater if they refuse to follow the protocols. (*Id.*)

### 7.    Other Precautions

Plaintiffs propose that show times be staggered to ensure that capacity is controlled and facilities are properly cleaned. (*Id.* at 21.) Further, hand sanitizer stations will be located throughout the facilities. (*Id.*) Additionally, HVAC system air exchangers will be implemented to maximize the replacement of indoor air with fresh air. (*Id.*)

---

[8] In its Reply, Plaintiffs for the first time agree to not serve concessions until New Jersey reopens indoor dining. (ECF No. 29 at 17 n.12.)

Despite these proposed protocols, Defendants have not allowed the reopening of movie theaters in New Jersey.

### E.      Procedural History

Plaintiffs filed the Complaint on July 6, 2020, alleging violations of the Equal Protection Clause under the Fourteenth Amendment (Count One), violations of freedom of speech under the First Amendment (Count Two), violations of the Due Process Clause under the Fourteenth Amendment (Count Three), violations of the Takings Clause under the Fifth Amendment (Count Four), Article I, ¶ 1 of the New Jersey Constitution (Count Five), and Article I, ¶ 20 of the New Jersey Constitution (Count Six). (*See* ECF No. 1.) One week later, on July 13, 2020, Plaintiffs filed a proposed order to show cause seeking a temporary restraining order ("TRO") and preliminary injunction to enjoin Defendants from "enforcing any Executive Orders, or other actions, against movie theaters, requiring their closure, or imposing different terms for opening to the public than those imposed upon religious or political indoor gatherings." (ECF No. 19-1 at 1–2.) On July 14, 2020, Plaintiffs filed a Motion for Preliminary Injunction. (ECF No. 21.) The same day, this Court denied Plaintiffs' request for a TRO and proceeded by way of Order to Show Cause (ECF No. 22) requiring Defendants to show cause why Plaintiffs' Motion for Preliminary Injunction (ECF No. 21) should not be granted. On July 24, 2020, Defendants filed an Opposition to Plaintiffs' Motion for Preliminary Injunction. (ECF No. 26.) On July 31, 2020, Plaintiffs filed a Reply to Defendants' Opposition. (ECF No. 29.) On August 4, 2020, Defendants filed a Letter concerning the issuance of EO 173. (ECF No. 30.) Additionally, on August 4, 2020, Defendants filed a Notice of Supplemental Authority (ECF No. 32), and Plaintiffs filed a Letter in Reply to Defendants' Letter (ECF No. 33). On August 5, 2020, Plaintiffs filed a Letter objecting to Defendants' Notice

of Supplemental Authority. (ECF No. 34.)[9] Later on August 5, 2020, the Court conducted oral

argument on the Motion. (ECF No. 35.)

## II.   LEGAL STANDARD

Preliminary injunctions are "extraordinary remed[ies], which should be granted only in

limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir.

2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*

*Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). To obtain preliminary relief, a movant must show:

> (1) a reasonable probability of eventual success in the litigation, and
> (2) that it will be irreparably injured . . . if relief is not
> granted . . . . [In addition,] the district court, in considering whether
> to grant a preliminary injunction, should take into account, when
> they are relevant, (3) the possibility of harm to other interested
> persons from the grant or denial of the injunction, and (4) the public
> interest.

*Reilly v. Cty. of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Port Auth. v.*

*Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted)).

The first two factors are the "most critical." *Reilly,* 858 F.3d at 179. The movant bears the

burden of showing that these four factors weigh in favor of granting the injunction, and a failure

to establish any one factor will render a preliminary injunction inappropriate. *Ferring*, 765 F.3d at

210. *See also Am. Tel. & Tel. Co. v. Winback Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d

Cir. 1994) (holding that a party must produce sufficient evidence of all four factors prior to

granting injunctive relief).

---

[9] For the purposes of this Opinion, the Court considered Defendants' Notice of Supplemental
Authority (ECF No. 32) and Plaintiffs' Letter in response (ECF No. 34). Additionally, the Court
allowed oral argument on the positions raised in the letters.

III.    DECISION

    A.    **Reasonable Probability of Eventual Success in the Litigation**

        1.    **The Governor's Executive Power**

While Plaintiffs do not dispute Governor Murphy's general ability to enact executive orders, the Court for the purposes of this Opinion finds it appropriate to consider the extent of the Governor's executive power. The challenged executive order relies on the Governor's authority under "the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4." N.J. Exec. Order 157 (June 26, 2020).

"It is well established that the executive's power to issue an emergency order must stem from an act of the Legislature or from executive authority under the Constitution." *Worthington v. Fauver*, 440 A.2d 1128, 1140 (N.J. 1982) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). In New Jersey, "[t]he authority of the Governor derives from Article V of the [New Jersey] State Constitution[,]" *Bullet Hole, Inc. v. Dunbar*, 763 A.2d 295, 301 (N.J. Super. Ct. App. Div. 2000), which states that "[t]he executive power shall be vested in a Governor." N.J. Const. art. V, § 1, P 1. Specifically, the Governor:

> shall take care that the laws be faithfully executed. To this end he shall have power, by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State; but this power shall not be construed to authorize any action or proceeding against the Legislature.

N.J. Const. art. V, § 1, P 11.

One method a governor may use to ensure the laws are "faithfully executed" is to issue an executive order. *See Kenny v. Byrne*, 365 A.2d 211, 215 (N.J. Super. Ct. App. Div. 1976).

Executive orders are a "well-accepted tool of gubernatorial actions." *Perth Amboy Bd. of Educ. v. Christie*, 997 A.2d 262, 267 (N.J. Super. Ct. App. Div. 2010).

> [T]he Governor[,] when he issues proclamations and exercises his ordinance power generally, [and] the administrative agencies[,] when they exercise rule-making power[,] may seem to be exercising legislative power, but such powers, at least in the case of the Governor and the courts, are inherent and essential to the performance of the primary functions for which their offices are created in the Constitution.

*Winberry v. Salisbury*, 74 A.2d 406, 412 (N.J. 1950).

In New Jersey, the legislature, in furtherance of the Executive's constitutional obligation, empowered the Governor—via the Department of Health—to take certain actions when faced with a state-wide health emergency. For example, the Emergency Health Powers Act states:

> With respect to a declared state of public health emergency, the [Commissioner of Health] may take all reasonable and necessary measures to prevent the transmission of infectious disease or exposure to toxins or chemicals and apply proper controls and treatment for infectious disease or exposure to toxins or chemicals.

N.J. Stat. Ann. § 26:13-12.

Generally, when the Governor is "acting consistently with express or implied authority from the Legislature," his action should be given "the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Bullet Hole*, 763 A.2d at 301. However, an executive order may still be deemed unconstitutional if it "represent[s] a usurpation of legislative power by the executive branch" or runs afoul against the principles of the U.S. Constitution. *See Worthington*, 440 A.2d at 1140; *see also Sussman v. Cowan*, 376 F. Supp. 1000, 1001–02 (D.N.J. 1974) (deeming unconstitutional an executive order that was an overbroad restriction on free speech).

Here, Plaintiffs do not dispute the New Jersey legislature has bestowed upon Defendants the ability to take actions in the face of a health crisis. Plaintiffs do, however, contend the challenged executive orders are unconstitutional. (*See generally* ECF No. 22-1.) Indeed, while the Governor may have the authority to issue certain executive orders to combat a health crisis, those orders—because they are government regulations—must comport with constitutional principles such as free speech and equal protection. *See, e.g.*, *Hinton v. Devine*, 633 F. Supp. 1023, 1039 (E.D. Pa. 1986) (finding that, although an executive order comported with separation of powers, it was nevertheless an invalid restriction of First Amendment rights); *City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 n.5 (9th Cir. 2018) (finding that, even if the Executive acted within the powers granted to him by Congress, the executive orders were invalid because they violated the Constitution).

As a federal court, this Court has the power to review the constitutionality of executive orders. *See U.S. v. Juarez-Escobar*, 25 F. Supp. 3d 774, 782 (W.D. Pa. 2014) (citing *Youngstown*, 343 U.S. 579; *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)). Further, if an executive order has a specific statutory foundation, it is given the effect of a legislative statute for the purposes of constitutional review. *See Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *City of Albuquerque v. U.S. Dept. of Interior*, 379 F.3d 901, 913 (10th Cir. 2004) (citing *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 & n.1 (5th Cir. 1967). As Plaintiffs do not dispute the specific statutory foundation Defendants have to implement their executive orders, and because Plaintiffs only dispute the constitutionality of Defendants' executive orders as they pertain to the First Amendment and the Equal Protection Clause, the Court will begin its analysis there.

## 2.     First Amendment and New Jersey Constitution Article I, ¶ 6 Claims

The First Amendment, "subject only to narrow and well-understood exceptions," allows individuals to speak freely without government interference with the content of their messages. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994). It is undisputed that movies and movie theaters are within the purview of the First Amendment and are therefore subject to its protections. *See, e.g.*, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952). In evaluating a First Amendment challenge to a government regulation, a court must first determine the appropriate level of scrutiny to apply. *See, e.g.*, *Nat'l Ass'n for the Advancement of Multijurisdiction Practice (NAAMJP) v. Castille*, 799 F.3d 216, 220 (3d Cir. 2015). However, if the regulation acts as a prior restraint, the regulation is presumptively invalid, and the First Amendment inquiry ends. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). Therefore, as a threshold matter, the Court must first determine if EO 157 is a prior restraint on Plaintiffs' free speech.

### i.     The Executive Orders Do Not Constitute a Prior Restraint

A regulation may be deemed presumptively invalid if it acts as a prior restraint—that is, when the expression of speech is subject to the prior approval of government officials. *See Shuttlesworth*, 394 U.S. at 151 ("An ordinance which makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official— is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."). However, not every government regulation that impacts future speech is a prior restraint. Indeed, the Supreme Court has held a regulation that results in action or punishment after the speech has been expressed is not a prior restraint and, therefore, the regulation is entitled to greater deference by the reviewing court. *See Alexander v. U.S.*, 509 U.S. 544, 554 (1993) ("[W]e have interpreted

14

the First Amendment as providing greater protection from prior restraints than from subsequent punishments.").

The Supreme Court in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), held  a regulation will only be considered a prior restraint—and therefore presumptively invalid—where (1) "it was conduct with a significant expressive element that drew the legal remedy in the first place"; or (2) where a regulation "based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. 706–07.

Here, due to the COVID-19 pandemic, movie theaters in New Jersey have been closed since March 16, 2020. *See* N.J. Exec. Order 104 (Mar. 16, 2020). Plaintiffs contend EO 157, which reopened certain indoor recreation and entertainment centers but not movie theaters, "operates as a blanket prior restraint on the operation of movie theaters throughout the state of New Jersey." (ECF No. 21-2 at 32.) Specifically, Plaintiffs argue that leaving the decision to keep movie theaters closed to "'the uncontrolled will of an official' is constitutionally indefensible." (*Id.* at 33.) The Court disagrees; in applying the Supreme Court's two-part analysis from *Arcara*, it is clear that neither scenario is applicable and that EO 157 is not a presumptively invalid prior restraint.

First, as to whether "it was conduct with a significant expressive element that drew the legal remedy in the first place," *Arcara*, 478 U.S. at 706, nothing in EO 157 or any of Governor Murphy's other executive orders is directed at limiting the expressive activity of movie theaters (i.e., the showing of movies). Rather, the orders are aimed at curtailing the spread of COVID-19 by keeping closed businesses that present a heightened risk of COVID-19 transmission.[10] In other words, the orders focus on the nonexpressive operations of the movie theater. Therefore, while the

---

[10] *See* N.J. Exec. Order 157 (keeping movie theaters and other "performance-based locations" closed "because those businesses necessitate a large number of individuals congregating together concurrently in one indoor location for an unusually prolonged period of time").

closure of physical movie theaters inherently limits speech, it is not the expressive conduct itself Defendants aimed to restrict when it executed the orders "in the first place." *Arcara*, 478 U.S. at 706.  Because of this, the first situation described in *Arcara* is inapplicable here. *See CH Royal Oak, LLC v. Whitmer*, No. 20-570, 2020 U.S. Dist. LEXIS 127296, at *11 (W.D. Mich. July 16, 2020) (declining to find an order to close movie theaters to be a prior restraint because the order was aimed at stopping the congregation of large crowds rather than speech).

Having determined that the orders are based on nonexpressive conduct, the Court looks to the second prong of *Arcana*, which requires the Court to determine whether the orders have "the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. at 707. The Court finds they do not. EO 157 is aimed at regulating the nonexpressive activity of the indoor operations "performance-based locations" and does not single out an expressive activity or have the effect of singling out expressive activity. Indeed, there are no references to the expressive content of movie theaters or any other "performance-based location" that was also closed by EO 157. Taken together, this demonstrates EO 157 does not act as a prior restraint and is therefore not presumptively invalid. *See Whitmer*, 2020 U.S. Dist. LEXIS 127296, at *13. Because the Court finds the executive orders do not constitute a prior restraint, it now must determine the appropriate level of scrutiny to apply.

### ii.    The Appropriate Level of Scrutiny

Government regulations that "suppress, disadvantage, or impose differential burdens upon speech because of its content" are deemed "content-based regulations" and are subject to strict scrutiny. *Turner Broad. Sys.*, 512 U.S. at 641. For a content-based regulation to pass muster under strict scrutiny, the Government must demonstrate the restriction on speech is "narrowly tailored to serve a compelling state interest." *U.S. v. Marzzarella*, 614 F.3d 85, 99 (3d Cir. 2010) (citing *FEC*

*v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007)). Conversely, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner Broad. Sys.*, 512 U.S. at 642. In order to be valid, these "content-neutral regulations" must "advance important governmental interests unrelated to the suppression of free speech and [] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997).

To determine whether a regulation is content-based or content-neutral, the Court must ask whether the regulation "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys.*, 512 U.S. at 643.

Plaintiffs contend EO 157 is a content-based restriction because "stated on the face" of the order is "the astounding proposition that the government may favor certain speakers over others." (ECF No. 29 at 14.) Defendants argue EO 157 is content-neutral because it does not target the expressive elements of theaters, "but instead imposes burdens on theaters and other industries in line with the risks they present." (*Id.*)

In looking at Defendants' orders, nothing in EO 157 or any of Governor Murphy's previous orders dictates the speech in which movie theaters can or cannot engage on the basis of content. That is, none of the orders allow for the dissemination of certain movies while disallowing other movies. Rather, EO 157 is a regulation that keeps closed the brick-and-mortar operations of movie theaters—and other performance-based venues—regardless of the content of the films the theaters wish to show. In that sense, the regulation is content-neutral. *See Whitmer*, 2020 U.S. Dist. LEXIS 127296, at *13 (finding a "blanket order" that keeps movie theaters closed to be a content-neutral regulation).[11]

---

[11] Defendants' counsel reiterated this point during oral argument:

Nevertheless, Plaintiffs contend Defendants' orders constitute a content-based restriction with the issuance of EO 173—which lowered the limit of indoor gatherings while exempting "religious services or celebrations, political activities, wedding ceremonies, funerals, and memorial services." N.J. Exec. Order 173. Plaintiffs argue that, even if EO 157 is content-neutral on its face, EO 173 demonstrates Defendants' orders are "employed as a pretext for censorship" and, therefore, are content-based. (ECF No. 29 at 21.) Specifically, Plaintiffs contend EO 173's favoring of gatherings such as weddings and memorial services demonstrates that Defendants' discrimination against movie theaters is content-based. (*See* Tr. 41:11–15.)

In cases where courts have found regulations to be content-based because of the pretext of censorship, the courts noted that while "there was no evidence that an illicit governmental motive was behind [the regulations], [they] were structured in a manner that raised suspicions that their objective was, in fact, the suppression of certain ideas." *Turner Broad. Sys.*, 512 U.S. at 660 (citing *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228-29 (1987); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983)).

---

> MR. FEIGENBAUM: [T]he Court [in *Whitmer*] said there wasn't discrimination based on expressive conduct because it was general clos[ure] of movie theaters. Not because there weren't similar claims of a lack of content neutrality.
>
> THE COURT: Your argument is that this executive order is content-neutral because it's not talking about what can be shown. It's saying basically nothing can be shown in this brick and mortar structure?
>
> MR. FEIGENBAUM: Exactly. That was the point that was made in the *Whitmer* decision.

(Tr. 51:9–19.)

Defendants contend that nothing in EO 173 indicates the orders as a whole are aimed at the suppression of the showing of movies. Rather, EO 173 is consistent with the government's position that the impetus for the closure of movie theaters is the conduct at the theaters, rather than the content that would be shown. At oral argument, Defendants highlighted this difference:

> MR. FEIGENBAUM: So even if the gathering's rule makes sure that a funeral can happen, even if a house party can happen with the same number of people, which is distinction based on conduct, not based on speech or based on communicative message. Even if, as we are, allowing the funeral to proceed with more people than a general house party, that says nothing about whether or not a movie theater can be open.

(Tr. 67:19–25.)

The Court agrees. Plaintiffs have not established EO 173 is evidence of pretext for the censorship of movies, and as a result have not demonstrated EO 157, as it pertains to the showing of movies, "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad Sys.*, 512 U.S. at 643. Indeed, Defendants indicated several reasons why the conduct at weddings and memorial services presented less risk than other indoor gatherings, including: (1) the benefit provided to attendees, (2) the infrequency of these events compared to others, (3) the ease of engaging in contact tracing compared to other events, and (4) extensiveness of planning for these events. *See* N.J. Exec. Order 173 at 5. Therefore, Plaintiffs have not demonstrated that Defendants' "objective was, in fact, the suppression of certain ideas." *Turner Broad. Sys.*, 512 U.S. at 660. As such, once again, Defendants have established the different treatment under EO 173 was not content-based, but rather based on conduct.

Finally, a law can still be content-neutral even if it "singles out a certain medium" so long as the differential treatment is "'justified by some special characteristic' of the particular medium

being regulated." *Turner Broad. Sys.*, 512 U.S. at 660-61. Defendants have detailed reasons—such as the difficulty of enforcing mask mandates and the risk of prolonged close contact indoors—for why movie theaters present special characteristics that justify their differing treatment from other locations. (*See* ECF No. 26 at 32.)

Accordingly, for all the reasons stated above, the Court finds Defendants' orders to be content-neutral. EO 157 will therefore be analyzed under intermediate scrutiny.

### iii.    Intermediate Scrutiny Analysis

"Having decided that the content-neutral analysis is appropriate, we must consider whether the [regulation] was [(1)] narrowly tailored [(2)] to serve a significant government interest, and [(3)] whether it left open ample alternative channels of communication." *Startzell v. City of Phila.*, 533 F.3d 183, 201 (3d Cir. 2008). Defendants bear the burden of demonstrating the constitutionality of its regulations. *Id.* Regarding the second requirement, Defendants have shown—and Plaintiffs concede—that EO 157 serves a significant, even compelling, governmental interest of protecting public health by preventing the spread of COVID-19.[12]

Turning to the narrowly-tailored requirement, a content-neutral regulation may satisfy this requirement "even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000). Therefore, this requirement is satisfied if the regulation "promotes a substantial government interest that would be achieved less

---

[12]

       THE COURT: But before I hear from [P]laintiff, does counsel agree that the Government has a compelling state interest to stop the spread of a pandemic? Yes or no?

       MR. CORN-REVERE: Yes.

(Tr. 4:21-25):

effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99 (1989). The Court finds Defendants have satisfied that requirement.

In closing indoor movie theater operations, Defendants are promoting the significant governmental interest of protecting public health by keeping closed areas that present heightened risks for COVID-19 transmission. Indeed, this important interest—protecting the public from the outbreak of disease during a global pandemic—would certainly be achieved less effectively if large groups were permitted to "congregate together concurrently in one indoor location for an unusually prolonged period of time." (ECF No. 21-3 at 111.) *See Whitmer*, 2020 U.S. Dist. LEXIS 127296, at *15. While the Court is cognizant of Plaintiffs' argument that churches present this same risk, Defendants need not enact the least restrictive means of promoting its substantial governmental interest in protecting the public health against COVID-19. Defendants' content-neutral regulation is permissible because it "promotes a substantial government interest that would be achieved less effectively" without it.[13]

In support of their argument, Defendants adequately present the particular risks associated with allowing movie theaters to open. First, the CDC indicates the risk of spread of COVID-19 increases during prolonged person to person interactions.[14] This risk will further increase as the number of people at a gathering and the time spent together increase.[15] Additionally, Defendants addressed the risks uniquely associated with performance-based locations by noting these businesses "necessitate a large number of individuals congregating together concurrently in one

---

[13] To the extent Plaintiffs argue they are being treated differently than churches, that argument is addressed *infra* in Section III(A)(3).

[14] *See* N.J. Exec. Order 157 at 4 (citing the CDC's suggestion that person-to-person contact creates "an unnecessary risk of transmission and must be prohibited").

[15] *Id.*

indoor location for an unusually prolonged period of time." N.J. Exec. Order 157. Furthermore, Defendants note that enforcing a mask mandate is particularly challenging in a dark movie theater, especially when patrons will need to remove their mask to consume concessions Plaintiffs intend to sell. (ECF No. 26 at 44.)

Based on this reasoning, the Court finds Defendants' measures—even if they are not the least restrictive means—to be narrowly tailored to the goal of preventing the spread of COVID-19. *See Whitmer*, 2020 U.S. Dist. LEXIS 127296, at *13 (finding an order closing the operation of indoor movie theaters to be narrowly tailored to the significant government interest in stopping the spread of COVID-19); *see also Brown v. City of Pittsburgh*, 586 F.3d 263, 277 (3d Cir. 2009) ("[A] content-neutral time, place, and manner regulation may be sufficiently tailored even if it is not 'the least restrictive or least intrusive means' of serving the government interests at stake."). In so finding, the Court also notes that courts have found the narrowly-tailored requirement to be "necessarily wider than usual" in the context of a public health crisis. *See Givens v. Newsom*, No. 20-852, 2020 WL 2307224, at *6 (E.D. Cal. May 8, 2020).

Therefore, the only remaining analytical prong is whether Defendants have left open ample alternative methods of communication. By closing only *indoor* movie theaters, Defendants are leaving open "ample alternative methods of communication" in the form of outdoor movie theaters and at-home streaming options.[16] *See Whitmer*, 2020 U.S. Dist. LEXIS 127296, at *15–16 (finding the closure of indoor movie theaters to still leave open ample alternative methods of communications despite plaintiffs being denied "its best or favored means of communication").

---

[16] *See* N.J. Exec. Order 157 at 5 ("[T]here are an especially high number of available outdoor and virtual options for members to the public to view and listen to movies and other performances, whether live or otherwise, that reduce the risk of indoor person-to-person contact and COVID-19 transmission.").

Based on the above, Defendants have satisfied their burden in demonstrating EO 157 is a content-neutral regulation that passes muster under intermediate scrutiny. Accordingly, Plaintiffs have not established a reasonable probability of success on the merits for their First Amendment or New Jersey Constitution Article I, ¶ 6 claims.

### 3.      Equal Protection and New Jersey Constitution Article I, ¶ 1 Claims

In addition to its First Amendment claim, Plaintiffs assert an equal protection claim that alleges Defendants' executive orders "fail to treat movie theatres like other 'similarly circumstanced' places of public assembly." (ECF No. 21-2 at 25.) "The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). As with First Amendment claims, a court's analysis of an Equal Protection Clause challenge to a regulation begins with an inquiry into the appropriate level of scrutiny.

### i.      The Appropriate Level of Scrutiny

A challenged government action under the Equal Protection Clause is subject to strict scrutiny if it interferes with a "fundamental right." *Brown v. Borough of Mahaffey*, 35 F.3d 846, 850 (3d Cir. 1994) (citing *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457–58 (1988)). To survive strict scrutiny, the government must show the challenged regulation is necessary to serve a compelling governmental interest. *U.S. v. Playboy Entm't Grp. Inc.*, 529 U.S. 803, 813 (2000). If, however, the challenged regulation does not discriminate against a suspect class or interfere with a fundamental right, a court applies a rational-basis review. *See In re Asbestos Litig.*, 829 F.2d 1233, 1238 (3d Cir. 1987) ("[A]s a general rule, classifications that neither regulate suspect classes nor burden fundamental rights must be sustained if they are rationally related to a legitimate governmental interest."). Under rational basis, government regulations are "presumed to be valid

and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Plaintiffs contend this Court should apply strict scrutiny because Defendants have declined to allow the reopening of movie theaters while allowing the reopening of indoor religious services—thereby interfering with Plaintiffs' fundamental First Amendment rights. (ECF No. 21-2 at 25.) Specifically, they argue that because movie theaters and movies are "included within the free speech and free press guaranty of the First and Fourteenth Amendments," their adverse treatment by Defendants is a violation of the Equal Protection Clause. (*Id.* at 26.) The Court disagrees.

This Court has already found Plaintiffs are not likely to succeed on the merits of their First Amendment and Article I, ¶ 6 claims. *See infra* Section III(A)(2). Absent such a violation, there can be no violation of the Equal Protection Clause based on Plaintiffs' allegations. *See Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1294 (3d Cir. 1993) (citing *Lyng v. Castillo*, 477 U.S. 635, 638–39) (finding that absent a violation of a "fundamental right, plaintiffs' equal protection claim merits no heightened scrutiny").

Further, the cases on which Plaintiffs rely to support their argument that strict scrutiny should be applied are inapposite. In each of those cases, strict scrutiny was applied to regulations which directly targeted expressive conduct and thereby restricted the plaintiff's rights under the First Amendment.[17] Here, EO 157 does not directly target the expressive conduct of movie

---

[17] *See, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) (applying strict scrutiny to a regulation taxing ink); *Police Dept. of City of Chi. v. Mosely*, 408 U.S. 92 (1972) (applying strict scrutiny to a ban on picketing); *Niemotko v. Maryland*, 340 U.S. 268 (1951) (applying strict scrutiny to punishment on gathering for religious purposes in a public place without a permit).

theaters, but instead targets the brick-and-mortar operations of indoor performance-based venues. Therefore, the First Amendment, and, by extension, the Equal Protection Clause, is not violated.

Nevertheless, Plaintiffs still maintain strict scrutiny should apply because Defendants—through their orders—are favoring some speakers (churches) over other speakers (movie theaters). (ECF No. 21-2 at 27.) However, simply being treated differently does not necessitate the use of strict scrutiny. *See Romer v. Evans*, 517 U.S. 620, 631 (1996). As the Honorable Robert B. Kugler, U.S.D.J., explained, as long as there is no violation of a fundamental right or differences being drawn along suspect lines, the court applies rational-basis review even where it is "factually probably correct" that Plaintiffs are "being treated unequally and disproportionately." Transcript of June 19, 2020 Oral Argument ("*Atilis* Tr."), ECF No. 30 at 34:14-16, *Atilis Gym Bellmawr, LLC v. Murphy* (2020) (No. 20-6347).

Ultimately, when government regulations of businesses do not implicate fundamental rights, the Court applies a rational-basis review. *See L.A. v. Hoffman*, 144 F. Supp. 3d 649, 675 (D.N.J. 2015); *see also Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 426 (2010). Because this is a business regulation that ultimately does not infringe on fundamental rights, the Court will proceed under rational-basis review.

### ii.    Rational-Basis Review

In applying rational-basis review, "the Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer*, 517 U.S. at 631 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Government regulations are "presumed to be valid and will be sustained if the classification drawn . . . is rationally related

to a legitimate state interest." *Cleburne*, 473 U.S. at 440. Indeed, "the threshold for upholding distinctions in a statute under rational-basis review is extremely low." *U.S. v. Pollard*, 326 F.3d 397, 408 (3d Cir. 2003). It asks whether there is "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Cabrera v. AG U.S.*, 921 F.3d 401, 404 (3d Cir. 2019) (quoting *Pollard*, 326 F.3d at 407). This legitimate purpose "may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communs., Inc.*, 508 U.S. 307, 315 (1993). Rational-basis review "confers a presumption of validity on legislation" that must be rebutted by the challenger. *Real Alts., Inc. v. Sec'y of HHS*, 867 F.3d 338, 348 (3d Cir. 2017). To do so, a challenger "must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Brian B. v. Penn. Dep't. of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000).

Further, the Supreme Court has noted that rational-basis review in equal protection analysis "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *See Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)); *see also, e.g.*, *Dandridge v. Williams*, 397 U.S. 471, 486 (1970). Nor does it authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. *Heller*, 509 U.S. at 319.

Plaintiffs contend EO 157 fails under a rational-basis review because Defendants based their decision on "the government's stated preference for other speakers, not on discernable public health distinctions." (ECF No. 21-2 at 31.) Specifically, Plaintiffs argue Defendants' orders

allowing the opening of places of worship, libraries, and shopping malls—while continuing the closure of movie theaters—"lacks a logical explanation." (*Id.*)

The Court begins by determining whether Defendants' proposed interests for passing EO 157 are legitimate. Plaintiffs do not dispute that the protection of public health by attempting to stop the spread of COVID-19 is a compelling state interest. *See infra* Section III(A)(2)(iii) n.12. Therefore, the Court need only determine whether EO 157 is rationally related to the goal of stopping the spread of COVID-19.

Plaintiffs argue the disparate treatment of movie theaters compared to shopping malls, libraries, and places of worship are not rationally related to the interest of public health. (ECF No. 21-2 at 31–32.) Specifically, Plaintiffs claim that movie theaters present a lower risk profile of spreading COVID-19 than places of worship do. (*Id.*)

In response to Plaintiffs' challenge, Defendants present several reasons for why their distinction between movie theaters and churches is rational. First, as stated above, the CDC indicates risk of spread of COVID-19 increases during prolonged person to person interactions, which increase as the number of people at a gathering spend more time together. Defendants addressed the risks uniquely associated with performance-based locations by noting these businesses "necessitate a large number of individuals congregating together concurrently in one indoor location for an unusually prolonged period of time." N.J. Exec. Order 157 at 5. Defendants further highlight the differences between indoor movie theater operations and religious services by noting the mask mandate is more difficult to enforce in a dark theater than at a religious service. (ECF No. 26 at 44.) Additionally, Defendants point out the removal of a religious patron's mask

to engage in religious practice (to accept communion or sip wine) takes less time than for a movie theater patron to consume concessions Plaintiffs intend to sell.[18] (*Id.*)

As to the distinction between movie theaters and other brick-and-mortar locations such as libraries and shopping malls, Defendants similarly argue the distinction is rationally related to the goal of stopping the spread of COVID-19. They contend the features of performance-based venues that present the highest risk of spreading COVID-19 are the amount of time individuals spend together in a single room and the difficulty in enforcing customer mask mandates. Defendants argue libraries and shopping malls do not present either of those risks. Indeed, Defendants' orders require shopping malls to remove "all areas with communal seating," and to close vending machines. New Jersey Office of Emergency Management Admin. Order 2020-16 ¶¶ 7, 9.

However, Plaintiffs, through their expert, Dr. David F. Goldsmith, MSPH, Ph.D. ("Dr. Goldsmith"), insist there is no data indicating movie theaters present a higher risk of COVID-19 transmission than those indoor premises currently allowed to be opened—i.e., churches, shopping malls, and libraries. (ECF No. 29 at 8.) In his report, Dr. Goldsmith concludes:

> (1) movie theatres constitute a lower risk for transmission of COVID-19 than places of worship; (2) Defendants have not demonstrated that theaters represent a greater or even equal risk for transmission of COVID-19 than places of worship or shopping malls; (3) Plaintiffs have presented a comprehensive set of guidelines that will be effective in preventing the transmission of COVID-19 to both moviegoers as well as theater employees and managers; and (4) when movie theatre audience members consume food or drink in an auditorium during a movie, there is less risk of transmission than in traditional indoor dining situations.

(ECF No. 29 at 8–9; *see generally* ECF No. 29-1.)

---

[18] *See infra* Section I(D)(8) n.8.

First, the Court has no doubts as to the qualifications of Dr. Goldsmith or his ability to produce a thorough expert report.[19] However, this report is insufficient for Plaintiffs to overcome their burden to "negate every conceivable justification" for Defendants regulations. *Brian B.*, 230 F.3d at 586.

Ultimately, this Court is compelled under rational-basis review to accept Defendants' classification of movie theaters even when there may be "an imperfect fit between means and ends." *Heller*, 509 U.S. at 321. Further, Defendants do not need to provide any scientific reasoning to survive rational-basis review, as regulations do not fail under rational-basis review if they were "not made with mathematical nicety." *Dandridge*, 397 U.S. at 485 (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, (1911)). Therefore, while Plaintiffs contend Defendants have failed to present any data to indicate movie theaters present a higher risk profile than other indoor premises that are allowed to be open, Defendants are not required to present such data to pass muster under rational-basis review. *See Beach Comms.*, 508 U.S. at 313 ("A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. [A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.").

Ultimately, Dr. Goldsmith's report parrots Plaintiffs' proposed protocols and bootstraps them into a report. As Judge Kugler articulated, a regulation will pass muster under a rational basis review if there is a "plausible policy reason" for the justification, based on the science available at the time—whether or not that science or those reasons ultimately turn out to be incorrect. *Atilis* Tr. 34:22–35:3. In any event, Defendants have presented conceivable justification that keeping movie theaters closed while opening churches, shopping malls, and libraries is rationally related to the

---

[19] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

goal of stopping the transmission of COVID-19. Accordingly, EO 157 passes constitutional muster under rational basis scrutiny.

In so finding, this Court also notes the unique and unprecedented challenge of dealing with the COVID-19 pandemic. In situations such as these, the Supreme Court "has distinctly recognized the authority of a State to enact . . . quarantine laws and 'health laws of every description,'" derived from the State's "police power" to "protect the public health and the public safety." *Jacobson v. Mass.*, 197 U.S. 11, 24–25 (1905). During a public health crisis, courts will typically only strike down laws when (1) they are completely baseless; or (2) directly impinge upon fundamental rights. *Id.* at 31. Here, the Court has found EO 157 to not only have a rational relation to, but be narrowly tailored to, the goal of stopping the spread of COVID-19. *See infra* Section III(A)(2)(iii). Further, the regulation does not directly impinge on fundamental rights. In dealing with COVID-19, health experts and state officials are constantly learning new information about the disease and how to stop it. With over 5.4 million cases and 170,000 deaths in the United States alone[20], the COVID-19 pandemic is the very sort of health crisis envisioned in *Jacobson*. Although rights do not disappear during these times, the Supreme Court has stressed the importance of allowing states some flexibility as they respond to the spread of COVID-19. In a concurring opinion rejecting a church's challenge to a limit on their worship services in light of the current pandemic, Chief Justice Roberts stated:

> Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38, 25 S. Ct. 358, 49 L. Ed. 643 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U. S. 417, 427, 94 S. Ct. 700, 38 L. Ed. 2d 618 (1974). Where

---

[20] Johns Hopkins University of Medicine, Coronavirus Resource Center, *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html (last visited Aug. 18, 2020)

> those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985).

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020).

Ultimately, Defendants have been at the forefront of dealing with this pandemic and its effects since March of this year. EO 157 and their other orders do not infringe directly on the fundamental rights of movie theaters, nor do they draw distinctions along suspect lines. *Jacobson* teaches that this Court will not substitute its judgment over the judgment of those who are politically accountable to the citizens of its state. Therefore, rational basis is the appropriate review for this claim, and Plaintiffs have not satisfied their burden to demonstrate Defendants' orders are not rationally related to the legitimate state interest in stopping the spread of COVID-19. Accordingly, the Court finds that Plaintiffs are unlikely to succeed on the merits of their Equal Protection and Article I, ¶ 1 claims.

### B.  Irreparable Harm

To show irreparable harm, a plaintiff must demonstrate there is "a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000.) Plaintiffs contend they are suffering irreparable harm because (1) they have been deprived of their First Amendment rights, and (2) they have endured a substantial loss in business. (ECF No. 21-2 at 33–34.)

First, Plaintiffs argue they have suffered irreparable harm because they have been deprived of their First Amendment rights. (ECF No. 21-2 at 33.) Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976). However, because this Court has found Plaintiffs have not suffered a constitutional violation, this argument is inapplicable.

Additionally, "economic harms are generally insufficient to show irreparable harm in the context of such extraordinary emergency relief." *Benner v. Wolf*, No. 20-775, 2020 U.S. Dist. LEXIS 89425, at *22 (M.D. Pa. May 21, 2020) (citing *Ecri v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)). While Plaintiffs have undoubtedly suffered severe economic loss since the beginning of the COVID-19 pandemic, they have failed to demonstrate the damages they suffered constitute irreparable harm beyond economic loss. Indeed, it is speculative to state that Defendants' orders have resulted in irreparable harm. Therefore, even if injunctive relief were to be granted and theaters in New Jersey were to be open, it is merely speculative to say Plaintiffs would be relieved. Accordingly, because Plaintiffs' purported losses are financial and largely speculative at this time, Plaintiffs have failed to carry their burden of demonstrating irreparable harm.

Because Plaintiff has failed to meet the two "most critical" factors for granting preliminary injunctive relief, the Court need not address the final two factors. *See Reilly*, 858 F.3d at 176 ("If these gateway factors are met, a court *then* considers the remaining two factors . . . ." (emphasis added)); *see also Sandoz, Inc. v. United Therapeutics Corp.*, No. 19-10170, 2020 U.S. Dist. LEXIS 27606, at *46 (denying preliminary injunction and declining to analyze the final two factors where plaintiff failed to satisfy the gateway factors).

**IV.**    **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

An appropriate Order will follow.


**Date: August 18, 2020**                              */s/ Brian R. Martinotti*_____
                                                                            **HON. BRIAN R. MARTINOTTI**
                                                                            **UNITED STATES DISTRICT JUDGE**